[No. B187299. Second Dist., Div. Seven. Nov. 20, 2006.]

ERIC TAYLOR, Plaintiff and Appellant, v.
CITY OF LOS ANGELES DEPARTMENT OF WATER AND POWER
et al., Defendants and Respondents.

## Counsel

Law Office of Jill B. Shigut, Jill B. Shigut; Law Office of Jerry L. Webb and Jerry L. Webb for Plaintiff and Appellant.

Rockard J. Delgadillo, City Attorney, Lisa S. Berger, Deputy City Attorney; and Richard M. Brown for Defendants and Respondents.

OPINION

ZELON, J.—An engineer sued his municipal employer and supervisor for retaliation because he opposed race discrimination against a subordinate and for failure to prevent retaliation in violation of the California Fair Employment and Housing Act (Gov. Code,[1] § 12900 et seq.) (the FEHA). The trial court dismissed the action after sustaining defendants' general demurrer to the operative first amended complaint (complaint) without leave to amend.

We conclude the complaint sufficiently stated a cause of action for retaliation under both the materiality test followed by the California Supreme Court in *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028 [32 Cal.Rptr.3d 436, 116 P.3d 1123] (*Yanowitz*) and the deterrence test adopted by the United States Supreme Court in *Burlington, N. & S. F. R. Co. v. White* (2006) 548 U.S. ___ [165 L.Ed.2d 345, 126 S.Ct. 2405] (*Burlington*). We also hold that a supervisor can be held personally liable for retaliation under the FEHA (§ 12940, subd. (h)). As pleaded, the supervisor's conduct is further not barred by the governmental immunity provisions of section 820.2. In addition, we find subdivision (k) of section 12940 is applicable to a cause of action for failure to prevent retaliation. Accordingly, we reverse.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. *FACTS*

The facts discussed below are based on the allegations contained in the complaint.

#### A. *Taylor's Employment and Supervisory History*

Plaintiff and appellant Eric Taylor is an electrical engineer employed by defendant and respondent City of Los Angeles Department of Water and Power (DWP). Initially hired as an electrical engineering assistant in 1988, Taylor was promoted to electrical engineering associate II and III in 1992 and 2000 respectively. Taylor's supervisor, defendant and respondent Bruce Hamer, named him supervising lead engineer in 2002. In this capacity, Taylor directly supervised three DWP and three contract employees in the fiber optic enterprise group, including Donald Coleman, a 13-year DWP employee. Hamer further recommended that Taylor attend a series of in-house classes leading to a certificate in supervision. Taylor did so with the goal of

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

advancing to full engineer, a promotion with a potential salary increase of $25,000 and other benefits.

### B. *Taylor's Opposition to Alleged Race Discrimination against Coleman*

On May 16, 2003, Hamer terminated Coleman for cause without first notifying Taylor, Coleman's immediate supervisor. On May 19 and 22, Coleman filed two complaints with the DWP equal employment opportunity (EEO) office. Coleman claimed wrongful termination because of his race (Black) and alleged the reasons for his termination were pretextual. Coleman identified Taylor as a supporting and material witness, specified certain information to which he would testify, and subpoenaed him to appear at his termination hearing. Over the next six months, Taylor opposed Coleman's termination by providing information to the EEO office, participating in several investigative interviews, and testifying in Coleman's support at the hearing. DWP ultimately reinstated Coleman with full backpay 10 months later.

### C. *Alleged Retaliation Against Taylor for Opposing Discrimination*

Taylor pleaded that Hamer retaliated against him for opposing race discrimination against Coleman.

#### 1. *After Taylor was Identified as Coleman's Supporting Witness*

On May 29, 2003, approximately one week after Coleman identified Taylor as a supporting witness on his race discrimination complaint, Hamer showed Taylor a new organizational chart that designated another employee to take his place as supervising lead engineer. On June 16, Hamer threatened to eliminate Taylor's 4/10 work schedule and implied he had abused time reporting. On July 1, Hamer stripped Taylor of his supervisory position and responsibilities. On July 9, Hamer repeated his threat to eliminate Taylor's 4/10 work schedule, and accused him of failing to fulfill his duties and of abusing time reporting.

#### 2. *After Hamer's Meeting with EEO Regarding Coleman's Complaint*

On July 21, 2003, Hamer met with DWP's EEO office regarding Coleman's discrimination charge. Two days later, Hamer informed one of Taylor's former subordinates that Taylor would be disciplined upon returning from vacation.

### 3. After Taylor Provided Information to EEO on Coleman's Complaint

On July 30, 2003, Taylor met with and provided information to the EEO office in support of Coleman's complaint. Thereafter, DWP offered a promotional examination for electrical engineer under an emergency appointment procedure. Having been a supervising lead engineer, Taylor applied for the promotion. Hamer headed up the promotional interviews for the position; Taylor interviewed with him on October 30.

### 4. After Taylor Testified in Opposition to Discrimination

On November 4, 2003, Taylor was subpoenaed to testify at Coleman's personnel hearing. On November 7, Hamer told Taylor he would not be selected for the electrical engineer promotion and stated, "I hope you weren't counting on this!" The position was given to another employee with fewer qualifications and no supervisory experience whom Taylor was instructed to train.

### 5. After Taylor Complained of Retaliation

That same month, Taylor complained to DWP's EEO office that he suffered retaliation from Hamer. Afterwards, Hamer exchanged Taylor's more important assignments with less important ones.

On December 5, 2003, Hamer replaced Taylor as contract administrator on equipment and consulting contracts. Hamer further transferred all his important technical contracts to the newly appointed electrical engineer trained by Taylor.

On December 8, Hamer created the LAON City Net Initiative, a document that outlined all projects with client ITA, including those assigned to Taylor. However, Hamer did not provide the document to Taylor for another 10 months. Not knowing his assignments and scope of work affected Taylor's job performance, his involvement in meetings, and his ability to write and administer customer service contracts under the initiative. Because Hamer did not tell Taylor about commitments made to customers, project schedules were delayed and customers were dissatisfied. On January 16, 2004, Hamer further removed Taylor as administrator of the customer ethernet contract and replaced him with a coworker.

### 6. After Taylor Further Opposed Discrimination and Retaliation

On January 22, 2004, Taylor again met with EEO investigators about Coleman's discrimination charges. In the interview, Taylor provided more

facts in support of Coleman and reiterated his claim of retaliation by Hamer. On January 23, Hamer met with the EEO office on the Coleman case. The following month, Hamer barred Taylor from attending all classes in the supervisory training series and restricted his attendance to only one to two classes per year. Taylor felt this action effectively eliminated promotional opportunities for him to become a full engineer.

### 7. *After Taylor Filed His Formal Retaliation Complaint*

On February 13, 2004, Taylor met once more with DWP's EEO office and requested assistance on the alleged retaliation by Hamer. On February 20, Taylor filed a formal EEO complaint of retaliation against Hamer.

On February 26, Hamer allegedly barred Taylor from an on-site training class that all other members of the fiber optic group were permitted to attend. For the next 10 months, Taylor was excluded from meetings, conference calls, monthly vendor and contractor meetings on 21 known occasions. In a constant position of being "uninformed," "uninvolved" and "undermined," Taylor felt his ability to perform his job was significantly hindered. This shutout hampered Taylor's ability to carry out his duties, write and administer customer contracts, maintain customer satisfaction, and carry out timely projects. When Taylor requested clarification, Hamer allegedly accused him of being "confrontation[al]" and "refusing to assume the assignments."

### 8. *After Taylor Requested Remedial Action on Account of Retaliation*

On June 16, 2004, Taylor met with EEO director Paul Wang concerning his complaints and the status of the investigation. Taylor was told "the report was caught up with a larger report that the [general manager] was sitting on" and he was "not to worry."

On June 23, Taylor asked Wang in writing for a transfer due to the alleged retaliation. On August 10, Wang instructed Hamer to accommodate Taylor's transfer request. That same month, Hamer labeled Taylor a "troublemaker" to managers of the groups to which Taylor requested a transfer. No transfer occurred.

On September 10, Hamer assigned Taylor duties that allegedly fell outside of his job description. Taylor filed a separate grievance against Hamer.

On September 14, Taylor again complained to the EEO office about the alleged ongoing retaliation, requested the status of the investigation and plans

for remedial action. On September 23, Hamer disclosed confidential information concerning Taylor's grievance to coworkers.

### 9. *After Taylor Filed His Labor Relations Grievance*

On September 30, 2004, Taylor filed a grievance with DWP's labor relations office. On October 5, Hamer again excluded Taylor from a meeting with his customer, City ITA Bureau of Sanitation.

### 10. *After Taylor's Labor Relations Grievance Was Granted*

On October 26, 2004, Taylor's grievance was granted. On October 29, Hamer allegedly wrote a memo to his supervisor, Ed Miller, recommending further promotion of the full engineer selected through the emergency appointment process. He included Taylor's out-of-classification responsibilities, the subject of his grievance, as a justification for promoting the other engineer.

Meanwhile, having passed the written civil service examination for full electrical engineer, Taylor took the oral portion of the civil service examination for the position. The opening questions were about his supervisory experience and training. Taylor felt disadvantaged because he had been stripped of his supervisory position, restricted on supervisory training, and denied the emergency appointment position. He ultimately placed in "Rank 9" on the civil service list for full engineer behind 29 other applicants, including the full engineer appointed under the emergency procedure favored by Hamer.

Taylor claimed there was "a causal link between [his] protected activity and the adverse employment action in that the retaliation commenced and/or intensified shortly after each act of opposition to [Hamer's] retaliation." "Although [Taylor] complained about the retaliation to DWP EEO and management, and requested that remedial action be taken, including transferring him to another department outside of [Hamer's] supervision, no immediate and effective action was taken and consequently the retaliation continued." As a result, Taylor allegedly suffered emotional distress accompanied with physical symptoms, loss of salary, benefits, opportunities, and reputation.

Taylor exhausted his administrative remedies. He filed a complaint with the Department of Fair Employment and Housing (DFEH) on September 30, 2004, and received his right-to-sue letter on November 4, 2004.

## II. *PROCEDURE*

Taylor filed this action on April 29, 2005. The complaint claimed retaliation (§ 12940, subd. (h)) and failure to take necessary remedial action (§ 12940, subds. (j)–(k)) in violation of the FEHA.

The trial court dismissed the action after sustaining defendants' demurrer without leave to amend on September 14, 2005. Relying on *Yanowitz*, the trial court determined that defendants could not be liable for claims of retaliation, because the adverse employment action claimed was not sufficiently "material" in affecting the terms and conditions of employment. It reasoned that there were no allegations of "actual termination," "demotion," "discipline," "reduction in pay or benefits," "egregious or intimidating or harassing conduct," or "any material significant employment action." The court held that the claimed "denial of emergency appointment," "threats of discipline," "negative comments" and "alteration of job responsibilities" did not amount to retaliation. The court also concluded that, as a public employee, Hamer was immune from personal liability for performing discretionary personnel actions. It further found no cause of action for failure to prevent retaliation under the FEHA.

Taylor timely appealed. While the appeal was pending, the United States Supreme Court issued its decision in *Burlington*, *supra*, 548 U.S. ___ [126 S.Ct. 2405] on June 22, 2006. We requested that the parties file supplemental briefs addressing *Burlington*.

## DISCUSSION

On appeal, Taylor contends: (1) the complaint alleged facts sufficient to constitute a cause of action for employment retaliation under either the *Yanowitz* or *Burlington* standards; (2) the FEHA imposes liability on supervisors as persons, who may be held personally liable for retaliation in violation of the FEHA; (3) retaliatory conduct does not constitute the exercise of discretion immune from individual liability; (4) employer failure to prevent retaliation is unlawful under the FEHA; and (5) the trial court abused its discretion by dismissing the action without leave to amend, particularly in light of new authority after the filing of the complaint.[2]

## I. *STANDARD OF REVIEW*

A general demurrer tests the sufficiency of the plaintiff's complaint, i.e., whether it states facts sufficient to constitute a cause of action upon which

---

[2] Because the other issues are dispositive, we need not reach the question of whether the trial court abused its discretion by dismissing the action without leave to amend.

relief may be based. (Code Civ. Proc., § 430.10, subd. (e); 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 899, p. 357.)

"On appeal from a judgment after a demurrer is sustained without leave to amend, we assume the truth of the facts alleged in the complaint, facts that reasonably can be inferred from those expressly pleaded, and facts of which judicial notice can be taken. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569].) We liberally construe the complaint to achieve substantial justice between the parties. (Code Civ. Proc., § 452.) In so doing, we construe the complaint in a reasonable manner and read the allegations in context. (*Schifando*, at p. 1081.) We determine de novo whether the complaint states facts sufficient to state a cause of action and whether the complaint or matters that are judicially noticeable disclose a complete defense. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415 [106 Cal.Rptr.2d 271, 21 P.3d 1189]; *Cochran v. Cochran* (1997) 56 Cal.App.4th 1115, 1120 [66 Cal.Rptr.2d 337].) We affirm the judgment if it is correct on any ground stated in the demurrer, regardless of the trial court's stated reasons. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317].)" (*Leonte v. ACS State & Local Solutions, Inc.* (2004) 123 Cal.App.4th 521, 525 [19 Cal.Rptr.3d 879].)

## II. *THE COMPLAINT ALLEGED FACTS SUFFICIENT TO CONSTITUTE A CAUSE OF ACTION FOR EMPLOYMENT RETALIATION*

 The FEHA prohibits "an employer, because of the race . . . of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." (§ 12940, subd. (a).)

With certain exceptions not at issue here, it is an "unlawful employment practice"[3] for "any employer . . . or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (§ 12940, subd. (h).) Regulations adopted by the Fair Employment and Housing Commission (FEHC) additionally provide that it is unlawful retaliation "for an employer or other covered entity to demote, suspend, reduce, fail to hire or consider for hire, fail to give equal consideration in making employment decisions, fail to treat impartially in the context of any recommendations for subsequent

---

[3] "Employment [p]ractice" includes "[a]ny act, omission, policy or decision of an employer or other covered entity affecting any of an individual's employment benefits or consideration for an employment benefit." (Cal. Code Regs., tit. 2, § 7286.5, subd. (g).)

employment which the employer or other covered entity may make, adversely affect working conditions or otherwise deny any employment benefit to an individual because that individual has opposed practices prohibited by the Act or has filed a complaint, testified, assisted or participated in any manner in an investigation, proceeding, or hearing conducted by the Commission or Department or their staffs." (Cal. Code Regs., tit. 2, § 7287.8, subd. (a).)

■ In construing the FEHA, California courts, where appropriate, look to federal authorities interpreting title VII of the Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e et seq.). ■ However, it is not appropriate to follow federal decisions if FEHA evidences a legislative intent different from that of Congress. (*Page v. Superior Court* (1995) 31 Cal.App.4th 1206, 1215–1216 [37 Cal.Rptr.2d 529].) Here, the elements of title VII and FEHA claims require that the plaintiff establish a prima facie case of retaliation, the defendant articulate a legitimate nonretaliatory explanation for its acts, and the plaintiff show that the defendant's proffered explanation is merely a pretext for the illegal termination. (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476 [4 Cal.Rptr.2d 522].) Consequently, to establish a prima facie case of retaliation under the FEHA, the plaintiff must show (1) he was engaged in a protected activity; (2) the employer subjected him to an adverse employment action; and (3) there was a causal link between the protected activity and the employer's action. (*Flait*, at p. 476.) We examine each of these elements below.

A. *Protected Activity*

■ Under the FEHA, protected activity includes opposition to "any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part" (§ 12940, subd. (h)) or "participated in any manner in an investigation, proceeding, or hearing" in an administrative proceeding. (Cal. Code Regs., tit. 2, § 7287.8, subd. (a).)

Defendants assert Taylor did not affirmatively show he was engaged in protected activity by merely pleading that he was named a witness on Coleman's two race discrimination complaints. However, the complaint did not plead only this single act of claimed opposition. Taylor also pleaded that he affirmatively "opposed" race discrimination when he "was subpoenaed to testify" at the personnel hearing, "met with" and "provided information" to the EEO office in support of Coleman's discrimination charge. Moreover, in his own behalf, Taylor later "filed a complaint" for retaliation as a result of having opposed race discrimination, which constituted further protected activity under the FEHA. Thus, Taylor alleged that he engaged in multiple protected activities. In accordance with the statute's plain language, we find Taylor sufficiently pleaded that he engaged in a protected activity.

## B. *Adverse Action*

Until recently, the law was unsettled; although there was "scant authority in California defining the meaning of an adverse employment action under the FEHA, a plethora of federal courts ha[d] considered the issue in construing the analogous federal antidiscrimination statute, and ha[d] reached differing conclusions. [Citations.]" (*Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1454 [116 Cal.Rptr.2d 602].)

■ The majority of federal circuit courts adopted the materiality standard, under which a retaliation claim lies only for an employment action that materially affects the terms and conditions of employment. (See, e.g., *Torres v. Pisano* (2d Cir. 1997) 116 F.3d 625, 640 [employer's single request for employee to withdraw Equal Employment Opportunity Commission complaint, without more, did not constitute adverse employment action]; *Von Gunten v. Maryland* (4th Cir. 2001) 243 F.3d 858, 867 [temporary withdrawal of use of a state· vehicle did not constitute an adverse employment action]; *Nguyen v. City of Cleveland* (6th Cir. 2000) 229 F.3d 559, 566–567 [mere temporal proximity between the filing of the discrimination charges and the failure to promote was not enough to support a retaliation claim]; *Ribando v. United Airlines, Inc.* (7th Cir. 1999) 200 F.3d 507, 510–511 [a letter of concern or counseling placed in the employee's file did not rise to the level of an adverse employment action]; *Washington v. Illinois Dept. of Revenue* (7th Cir. 2005) 420 F.3d 658, 662–663 [where the employee needed to work certain hours on account of her son's medical condition, a reassignment that did not affect pay or promotional opportunities was a materially adverse change]; *Brown v. Brody* (D.C. Cir. 1999) 339 U.S. App.D.C. 233 [199 F.3d 446, 457] [denial of lateral transfer with no loss in pay or benefits was not adverse employment action unless accompanied by some other materially adverse consequences affecting the terms, conditions, or privileges of present or future employment]; *Rochon v. Gonzales* (D.C. Cir. 2006) 370 U.S. App.D.C. 74 [438 F.3d 1211, 1217–1218, 1220] [employer's failure to investigate death threats against FBI agent's family was material to a retaliation claim].)

■ The Ninth Circuit adopted a broader deterrence test, which, consistent with Equal Employment Opportunity Commission (EEOC) guidelines,[4] views adverse action as " 'any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.' " (*Ray v. Henderson* (9th Cir. 2000) 217 F.3d 1234, 1242–1243 [adverse employment policy found in the elimination of

---

[4] EEOC Compliance Manual (1998) section 8, Retaliation, paragraph 8008. "The EEOC test covers lateral transfers, unfavorable job references, and changes in work schedules." (*Ray v. Henderson, supra*, 217 F.3d at p. 1243.)

employee involvement program and flexible start-time policy, institution of lockdown procedures, and disproportionate reduction of workload and pay of postal worker who complained about treatment of women].)

■ The California Supreme Court in *Yanowitz* elected to follow the materiality test. (*Yanowitz, supra*, 36 Cal.4th at p. 1036.) Ten months later, the United States Supreme Court in *Burlington* adopted the deterrence test. (*Burlington, supra*, 548 U.S. at p. ___ [126 S.Ct. at p. 2409].) Although the materiality and deterrence tests differ in some respects, we find that Taylor has sufficiently pleaded adverse action under both standards.

### 1. *The Materiality Test Under* Yanowitz

In *Yanowitz*, the California Supreme Court concluded that a sales manager's refusal to follow a supervisor's order to fire an insufficiently attractive sales associate, a policy she reasonably believed to be discriminatory, constituted protected activity under the FEHA. It held that an employer may not retaliate against an employee on the basis of such conduct when the employer, in light of all the circumstances, knows that the employee believes the order to be discriminatory, even when the employee does not explicitly state to her supervisor or employer that she believes the order to be discriminatory. (*Yanowitz, supra*, 36 Cal.4th at pp. 1036, 1071.)

In so holding, the court expressly rejected the deterrence test, concluding that the proper standard for defining an adverse employment action is the materiality test, a standard that requires an employer's adverse action to materially affect the terms and conditions of employment. (*Yanowitz, supra*, 36 Cal.4th at pp. 1036, 1050; see *Akers v. County of San Diego, supra*, 95 Cal.App.4th at pp. 1454–1457.)

The court further concluded that in determining whether an employee has been subjected to treatment that materially affects the terms and conditions of employment, it is appropriate to consider the "totality of the circumstances." (*Yanowitz, supra*, 36 Cal.4th at p. 1036.) "[T]here is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries. [Citations.] Enforcing a requirement that each act separately constitute an adverse employment action would subvert the purpose and intent of the statute." (*Id.* at pp. 1055–1056.)

The court held that the FEHA "protects an employee against unlawful discrimination with respect not only to so-called ultimate employment actions such as termination or demotion, but also the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her

career. Although a mere offensive utterance or even a pattern of social slights by either the employer or coemployees cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment for purposes of section 12940(a) (or give rise to a claim under section 12940(h)), the phrase 'terms, conditions, or privileges' of employment must be interpreted liberally and with a reasonable appreciation of the realities of the workplace in order to afford employees the appropriate and generous protection against employment discrimination that the FEHA was intended to provide." (*Yanowitz, supra,* 36 Cal.4th at pp. 1053–1054, fns. omitted.)

Examining the totality of the circumstances alleged, we find that Taylor sufficiently pleaded that he experienced adverse employment action as a result of opposing race discrimination against Coleman. Taylor alleged that Hamer stripped him of his supervisory position; threatened to terminate his 4/10 work schedule; barred him from completing the supervisory certification courses; embarrassed him before his subordinate; excluded him from meetings and deprived him of the information necessary to carry out his duties; undermined him by removing important contracts; denied him the emergency appointment to full engineer but required him to train the appointee; accused him of being confrontational; labeled him a troublemaker to prospective supervisors in other groups; disclosed confidential information about Taylor to his coworkers; and told him not to expect an emergency appointment to full engineer. This continuous course of conduct culminated in Taylor's low rank on the civil service list for full engineer, a position he was apparently groomed to assume prior to assisting Coleman with his race discrimination complaints. Under the *Yanowitz* analysis, it is reasonable to conclude that these events do not fall into the category of "mere offensive utterance or even a pattern of social slights." Rather, under "the realities of the workplace," they represent adverse employment actions "material" to the "terms, conditions or privileges" of Taylor's employment.

Contrary to defendants' contention, the case before us is not analogous to *McRae v. Department of Corrections and Rehabilitation* (2006) 142 Cal.App.4th 377 [48 Cal.Rptr.3d 313] (*McRae*). There, a surgeon alleged she was denied an appointment as chief medical officer at a separate prison facility because of her race. She argued that the complaint triggered a number of retaliatory actions by her employer that culminated in her involuntary transfer from the hospital where she worked to a position at the prison facility. (*Id.* at pp. 384–385.) The court held the jury's finding that the employee had been subjected to an adverse action was not supported by the evidence. What the employee contended was a continuous course of conduct was in fact a series of events, each bearing little relationship to the others, and at least some of which clearly were not the result of unlawful retaliation (e.g., leaving the emergency room without physician coverage; disobeying direct orders regarding patient family contact and failing to facilitate hospice;

making a telephone order to withhold antibiotics from a patient with pneumonia without an examination; arguing with two nurses over the improper removal of an ultraviolet light.) (*Id.* at pp. 383–384, 390.) The court concluded these incidents were not part of a process of progressive discipline and did not create an abusive work environment. (*Id.* at p. 390.)

The *McRae* court was careful to explain that the case differed "in significant ways" from *Yanowitz*, where as here, "a continuous course of conduct" was evident in that "all of the allegedly wrongful acts were engaged in by the plaintiff's immediate supervisor and his supervisor, and all were taken in response to a single protected act by the plaintiff." (*McRae, supra*, 142 Cal.App.4th at p. 391.) In contrast, *McRae* involved the allegedly wrongful acts taken by "many different persons, for different reasons, some of which indisputably had nothing to do with [the employee's] protected conduct." (*Ibid.*)

Given *Yanowitz*'s broad interpretation of the materiality test, the trial court erred in finding that a claim of retaliation would not lie.

### 2. *The Deterrence Test Under* Burlington

In *Burlington*, a railway company's female maintenance worker complained to her employer of alleged sexual harassment by her immediate supervisor. Afterwards, the supervisor reassigned her from forklift duty to standard track laborer tasks. The worker filed a complaint with the EEOC, alleging that the reassignment was unlawful gender discrimination and retaliation for her complaint. Subsequently, following a dispute with a different immediate supervisor, the worker was suspended without pay for purported insubordination. The employer later concluded that the worker had not been insubordinate, reinstated her, and awarded her backpay for the 37 days she had been suspended. The worker filed another EEOC charge and a Title VII action alleging that the employer retaliated against her for complaining about her supervisor's sexual harassment by reassigning her from forklift duty to standard track laborer tasks and suspending her without pay before reinstating her. (*Burlington, supra*, 548 U.S. at p. ___ [126 S.Ct. at pp. 2409–2410].)

The United States Supreme Court granted certiorari to resolve the disagreement among the circuits on the applicable standard under Title VII's antiretaliation provision. (*Burlington, supra*, 548 U.S. ___ [126 S.Ct. at p. 2410].) The court adopted the deterrence test. It determined that Title VII's antiretaliation provision (42 U.S.C.S. § 2000e-3(a)), unlike its substantive provision (42 U.S.C.S. § 2000e-2(a)), "does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." (*Burlington, supra*, at p. ___ [126 S.Ct. at p. 2409.) Rather, "the provision

covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant." (*Ibid.*) In the context of the case, the court held that "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." (*Ibid.*)

The court explained the language of Title VII's substantive and antiretaliation provisions differ in important ways. "The underscored words in the substantive provision—'hire,' 'discharge,' 'compensation, terms, conditions, or privileges of employment,' 'employment opportunities,' and 'status as an employee'—explicitly limit the scope of that provision to actions that affect employment or alter the conditions of the workplace. No such limiting words appear in the anti-retaliation provision." (*Burlington, supra,* 548 U.S. at p. ___ [126 S.Ct. at pp. 2411–2412].) Given these linguistic differences, the court concluded that "Congress intended the differences that its language suggests, for the two provisions differ not only in language but in purpose as well." (*Id.* at p. ___ [126 S.Ct. at p. 2412].) Citing to *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 800–801 [36 L.Ed.2d 668, 93 S.Ct. 1817], it reasoned that the antidiscrimination provision "seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status"; the "anti-retaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." (*Burlington, supra,* 548 U.S. ___ [126 S.Ct. at p. 2412].) As a result, "the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." (*Id.* at p. ___ [126 S.Ct. at pp. 2412–2413.) The Supreme Court further determined that neither its precedents nor the EEOC's interpretations support a contrary conclusion. (*Id.* at p. ___ [126 S.Ct. at p. 2413.])

Applying the deterrence test, the court found that there was a sufficient evidentiary basis to support the jury's verdict. (*Burlington, supra,* 548 U.S. ___ [126 S.Ct. at pp. 2416–2417].) Even though the worker's former and present duties fell within the same job description, the court found a jury could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee. Evidence presented showed the track labor duties were " 'more arduous and dirtier,' " while the forklift operator position required " 'more qualifications' " and held more " 'prestige.' " (*Id.* at p. ___ [126 S.Ct. at p. 2417.) Given that Title VII had been amended to permit recovery of make-whole compensatory and punitive damages, it also found reasonable the jury's conclusion that the 37-day suspension without pay was materially adverse. (548 U.S. at p. ___ [126 S.Ct. at p. 2417].)

Seeing no apparent differences in legislative intent for the anti-retaliation provisions of the FEHA and Title VII, we look to federal authorities interpreting Title VII. To apply the deterrence test, we examine defendants' actions to determine whether a jury could find they were so harmful as to dissuade a reasonable worker from making or supporting a charge of discrimination.

Here, Taylor claimed that Hamer stripped him of his supervisory position, made threats to end his 4/10 work schedule, barred him from completing the supervisory certification series, excluded him from meetings and the flow of business information, removed important contracts, denied him appointment to and discouraged him from promotion to full engineer, made accusations against him, disclosed his confidential information to others, and discouraged him from anticipating a promotion to full engineer. He also pleaded that DWP failed to accommodate his transfer request so that he could work in another department away from Hamer. Assuming the truth of these allegations, we conclude that a reasonable city engineer with nearly two decades of tenure and similar promotional objectives would be deterred from making or supporting a charge of discrimination.

Consequently, we also find Taylor sufficiently pleaded that he suffered adverse employment action under the deterrence test.[5]

### C. *Nexus Between Protected Activity and Adverse Action*

■ To establish a prima facie case, the plaintiff must show that there is a causal link between the protected activity and the employer's action. (*Flait v. North Am. Watch Corp., supra*, 3 Cal. App.4th at p. 476.) Close proximity in time of an adverse action to an employee's resistance or opposition to unlawful conduct is often strong evidence of a retaliatory motive. (*Strother v. S. Cal. Permanente Medical Group* (9th Cir. 1996) 79 F.3d 859, 868–869 [plaintiff made prima facie showing of retaliatory termination under the FEHA where employee was fired one day after filing a complaint with the DFEH]; *Flait, supra*, 3 Cal.App.4th at p. 476 [plaintiff made prima facie showing of retaliatory termination where employee was terminated a short time after complaining to supervisor of the supervisor's sexual harassment of a coworker, and harassing supervisor was responsible for termination].)

Here, Taylor pleaded a "causal link" between his "protected activity and the adverse employment action" in that the "retaliation commenced" and/or "intensified" "shortly after" "each act of opposition" to the race discrimination against Coleman or retaliation by Hamer. As a result of the ongoing

---

[5] On oral argument, although DWP argued that *Burlington* does not apply, it conceded that the complaint would survive a demurrer if it were applicable.

retaliation, he "engaged in further protected activity by opposing and reporting the retaliation" by Hamer to DWP's EEO office and filing a formal complaint. He then further "suffered adverse employment actions" under Hamer and enumerated those incidents on over 21 occasions, including his exclusion from supervisory training courses, meetings, conference calls and project information. He pleaded that his involvement in the protected activity caused Hamer to label him a "troublemaker," reassign his duties and assignments, strip him of his supervisory position, reduce his opportunity for promotion, deny him the emergency appointment to full engineer, discourage him from expecting a promotion, and rank others ahead of him on the civil service list for full engineer.

Even though Taylor did not specifically plead that Hamer was aware of his involvement in the protected activity, clearly DWP had actual notice when Coleman listed Taylor as a supporting witness on his complaints and when Taylor furnished information to its EEO office, testified at Coleman's hearing, requested a transfer, and filed complaints about Hamer. We further find compelling the timing—each incident of adverse action exacted by Hamer occurred within days of each act of opposition by Taylor. In view of the course of conduct over time, it is reasonable to infer that Hamer had at least constructive knowledge that Taylor had filed a grievance against him and requested a transfer, because Hamer allegedly told managers of other groups that Taylor was a "troublemaker." It is also reasonable to conclude that, as pleaded, Hamer's originally supportive attitude toward Taylor soured when he engaged in protected activity.

Accordingly, we find that Taylor sufficiently pleaded the causal link between the protected activity and defendants' adverse action.

## III. SUPERVISOR LIABILITY IS NOT BARRED

### A. A Supervisor May Be Personally Liable for Retaliation

Defendants contend that Hamer may not be held personally liable for retaliatory conduct. They erroneously rely on *Reno v. Baird* (1998) 18 Cal.4th 640, 663–664 [76 Cal.Rptr.2d 499, 957 P.2d 1333], which held that a supervisor may not be sued individually for discrimination in employment under the FEHA or under a common law cause of action for violation of the public policy expressed in the FEHA. There the court construed subdivision (a) of section 12940, which makes it unlawful "[f]or an employer" to discriminate against employees or applicants on any of several prohibited grounds. Relying on the statutory language the court held "individuals who

do not themselves qualify as employers may not be sued under the FEHA for alleged discriminatory acts." (*Reno v. Baird, supra,* 18 Cal.4th at p. 663.)

■ "A fundamental cannon [*sic*] of statutory construction is that words will be given their ordinary meaning." (*Liberto-Blanck v. City of Arroyo Grande* (C.D.Cal. 1999) 33 F.Supp.2d 1241, 1243.) The statutory construction in the FEHA suggests the Legislature made a policy decision to hold both employers and other individuals who engage in retaliatory acts responsible for such conduct. (33 F.Supp.2d at p. 1243.)

■ The present case involves subdivision (h) of section 12940, which makes it unlawful "[f]or any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part . . . ." The FEHA defines "person" as including "one or more individuals." (§ 12925, subd. (d).) It additionally provides that " '[s]upervisor' means any individual having the authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or the responsibility to direct them, or to adjust their grievances, or effectively to recommend that action, if, in connection with the foregoing, the exercise of that authority is not of a merely routine or clerical nature, but requires the use of independent judgment." (§ 12926, subd. (r).)

As a result, courts have concluded that supervisors can be held personally liable for retaliation as "persons" under the FEHA. (See *Walrath v. Sprinkel* (2002) 99 Cal.App.4th 1237, 1242 [121 Cal.Rptr.2d 806]; *Winarto v. Toshiba America Electronics Components* (9th Cir. 2001) 274 F.3d 1276, 1288; *Liberto-Blanck v. City of Arroyo Grande, supra,* 33 F.Supp.2d at p. 1244; *Peterson v. Santa Clara Valley Med. Ctr.* (N.D.Cal. 2000) 2000 U.S.Dist. Lexis 953 [2000 WL 98262]; *Soo v. United Parcel Service, Inc.,* (N.D.Cal. 1999) 73 F.Supp.2d 1126.) In each of these cases, *Reno v. Baird* was distinguished on the basis of the difference in the statutory language regarding retaliation and the reference to "person," indicating a legislative intent to allow individual liability for retaliation by supervisors. (See *Walrath v. Sprinkel, supra,* 99 Cal.App.4th at p. 1242.)

We agree with these cases and conclude that a supervisor may be held personally liable for retaliation under the FEHA. Accordingly, to the extent the trial court relied on the theory that supervisors cannot be liable for retaliation under FEHA, the trial court was incorrect.

### B. *Supervisor Retaliation Is Not Immune from Liability*

 The Government Tort Claims Act (§ 810 et seq.) governs all public entities and their employees. Under that act, public employees are liable for their torts unless a statute provides otherwise. (§ 820, subd. (a).) An exception to this general rule of liability is found in section 820.2, which codifies the traditional common law immunity afforded to the discretionary acts of a governmental official performed within the course and scope of his or her authority. (*Caldwell v. Montoya* (1995) 10 Cal.4th 972, 979–980 [42 Cal.Rptr.2d 842, 897 P.2d 1320] (*Caldwell*).) That statute states: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." (§ 820.2.) Relying on these principles, defendants asserted and the trial court concluded that Hamer was immune, as a public employee, from personal liability for performing discretionary personnel actions.

In *Caldwell, supra*, 10 Cal.4th at page 989, the court held, "as a matter of law, the decision by members of an elected school board whether to renew the contract of the district's superintendent is a basic policy decision, and thus a discretionary act of the kind for which public employees are entitled to personal immunity under section 820.2 of the Tort Claims Act. By the terms of section 820.2, such personal immunity applies even against liabilities imposed by prohibitory state statutes of general application such as FEHA, unless there is a clear indication of legislative intent that immunity be withdrawn in the particular case. There is no indication of legislative intent that, notwithstanding the statutory immunity for discretionary acts, public employees may be personally sued for personnel decisions which violate FEHA. Hence, that immunity must prevail, if otherwise applicable, over FEHA claims against public employees in their individual capacities."

In determining what is or is not discretionary, the court in *Caldwell, supra*, 10 Cal.4th at page 981, set forth: "almost all acts involve some choice among alternatives, and the statutory immunity thus cannot depend upon a literal or semantic parsing of the word 'discretion.' " The court, in quoting from *Johnson v. State of California* (1968) 69 Cal.2d 782, 790, 793 [73 Cal.Rptr. 240, 447 P.2d 352], stated that a " 'workable definition' " of immune discretionary acts distinguished between " 'planning' " and " 'operational' " functions of government. Thus immunity applies to " 'basic policy decisions' " but not to " 'ministerial . . .' decisions that merely implement a basic policy already formulated." (*Caldwell, supra*, at p. 981, italics omitted.)

For immunity to apply, the defendants must show that the decisions in question are properly considered as " ' "basic policy decision[s]" ' " made at the

"planning" stage of [the entity's] operations,' " rather than "routine duties incident to the normal operations" of the employee's office or position. (*Barner v. Leeds* (2000) 24 Cal.4th 676, 685 [102 Cal.Rptr.2d 97, 13 P.3d 704].) The acts alleged here do not fit within the type of policy decisions that the Supreme Court determined would be immune under the statute. The decisions regarding job assignments, training and promotion may not be characterized as a " ' "quasi-legislative policy-making [decision which is] sufficiently sensitive" [citation] to call for judicial abstention from interference that "might . . . affect the coordinate body's decision-making process" ' " of a coordinate branch of government. (*Ibid.*)

" '[I]n governmental tort cases, "the rule is liability, immunity is the exception." ' " (*Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 792 [221 Cal.Rptr. 840, 710 P.2d 907].) Accordingly, the alleged retaliatory actions by Hamer, as pleaded, are not the type accorded discretionary immunity under section 820.2.

## IV. *FAILURE TO PREVENT RETALIATION IS UNLAWFUL UNDER SECTION 12940, SUBDIVISION (K)*

Taylor's second cause of action claimed defendants failed to take appropriate corrective action to prevent retaliation in violation of section 12940, subdivisions (j) and (k). The trial court found no cause of action for failure to prevent retaliation under both subdivisions. On appeal, Taylor contests only the court's ruling on subdivision (k).

Subdivision (k) of section 12940 provides that it is unlawful "[f]or an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."

As discussed *ante*, Taylor has sufficiently pleaded his retaliation claim. The question is whether subdivision (k) of section 12940 permits a claim for failure to prevent or investigate discrimination, when the only cause of action at issue is retaliation, rather than discrimination or harassment as referenced under the subdivision.

The FEHA and California case law are silent on whether retaliation is a form of discrimination actionable under section 12940, subdivision (k). Recently, the United States District Court for the Northern District of California squarely confronted the issue in *Giovannetti v. Trs. of the Cal. State Univ.* (N.D.Cal. 2006) 2006 U.S.Dist. Lexis 41750 [2006 WL 1626990]. There, among other things, the plaintiff sued his employer for failure to

prevent discrimination and harassment in violation of FEHA under section 12940, subdivision (k). (2006 U.S.Dist. Lexis at *28 [2006 WL 1626990 at *1].) The court held that "in view of the liberal construction principles that underlie interpretation of FEHA, and the fact that retaliation claims themselves are defined as 'discriminat[ion]' under section 12940(h)," the plaintiff "may proceed to trial on this [section 12940, subdivision (k)] claim insofar as it is based on a failure to prevent retaliation, which is a form of discrimination." (2006 U.S.Dist. Lexis at *29 [2006 WL 1626990 at *9].)

The court's discussion in *Yanowitz* supports the conclusion that retaliation is a form of discrimination. "When the provisions of section 12940 are viewed as a whole, . . . we believe it is more reasonable to conclude that the Legislature intended to extend a comparable degree of protection both to employees who are subject to the types of basic forms of discrimination at which the FEHA is directed—that is, for example, discrimination on the basis of race or sex—and to employees who are discriminated against in retaliation for opposing such discrimination, rather than to interpret the statutory scheme as affording a greater degree of protection against improper retaliation than is afforded against direct discrimination. [Citations.]" (*Yanowitz, supra,* 36 Cal.4th at p. 1050.)

Looking to analogous federal statutory construction, in its analysis of retaliation under title IX of the 1972 Education Amendments (20 U.S.C. § 1681 et seq.), the United States Supreme Court announced that "retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination." (*Jackson v. Birmingham Bd. of Educ.* (2005) 544 U.S. 167, 174 [161 L.Ed.2d 361, 125 S.Ct. 1497].) The court concluded that "when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." (*Ibid.*) The court reasoned that it was error to conclude that Title IX does not prohibit retaliation because the " 'statute makes no mention of retaliation' " ignores the import of its repeated holdings "construing 'discrimination' under Title IX broadly." (544 U.S. at p. 174.)

In accordance with these views and the fundamental public policy of eliminating discrimination in the workplace under the FEHA, we conclude that retaliation is a form of discrimination actionable under section 12940, subdivision (k).

## DISPOSITION

The judgment is reversed. Plaintiff shall recover his costs on appeal.

Perluss, P. J., and Johnson, J., concurred.

Respondents' petition for review by the Supreme Court was denied February 14, 2007, S149140.