Filed 6/20/19; Certified for Partial Publication 7/17/19 CA3

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| SHIRLEY GALVAN, | C081092 |
| Plaintiff and Appellant, | (Super. Ct. No. 39-2014-00308392-CU-DE-STK) |
| v. | |
| DAMERON HOSPITAL ASSOCIATION et al., | |
| Defendants and Respondents. | |

Plaintiff Shirley Galvan brings this employment discrimination case against her former employer Dameron Hospital Association (Dameron) and former supervisor Doreen Alvarez (collectively defendants), alleging that she was discriminated against and subjected to harassment based on her national origin (Filipino) and age (54) at the hands of Alvarez, and that Dameron failed to take action to prevent it in violation of the

1

California Fair Employment and Housing Act (the FEHA) (Gov. Code, § 12900 et seq.).[1] Galvan claims that she was forced to take a medical leave of absence and ultimately quit due to the intolerable working conditions created by Alvarez in order to accomplish Alvarez's goal of getting rid of older, Filipino employees, like Galvan, who, in Alvarez's words, "could not speak English," had "been there too long," and "ma[d]e too much money." The operative second amended complaint asserts causes of action for discrimination (§ 12940, subd. (a); against Dameron), harassment (§ 12940, subd. (j); against Dameron and Alvarez), failure to take all reasonable steps to prevent discrimination and harassment (§ 12940, subd. (k); against Dameron), wrongful termination in violation of public policy (against Dameron), declaratory relief (discrimination) (against Dameron), and injunctive relief (Code Civ. Proc., § 526; against Dameron).[2] The complaint also prays for punitive damages.

Defendants moved for summary judgment, or in the alternative summary adjudication. The trial court granted defendants' motion for summary judgment. The trial court found that Galvan could not make a prima facie showing of discrimination because she could not establish that she suffered an adverse employment action or that Dameron acted with a discriminatory motive. The trial court likewise found that she could not make a prima facie showing of harassment because she cannot show that any of the complained of conduct was based on her national origin or age. The trial court determined that the remaining causes of action and claims for injunctive and declaratory

---

[1]     Undesignated statutory references are to the Government Code.

[2]     While denominated "causes of action" in the complaint, declaratory and injunctive relief are remedies, not causes of action. (*McDowell v. Watson* (1997) 59 Cal.App.4th 1155, 1159.)

2

relief and punitive damages were derivative of the discrimination and harassment causes of action, and thus, could not survive summary judgment.[3]

Galvan appeals, arguing there are triable issues of material fact as to each of her causes of action and her claims for declaratory relief (discrimination), injunctive relief, and punitive damages. We agree in part. We will reverse the judgment and direct the trial court to vacate its order granting summary judgment and enter a new order granting summary adjudication of Galvan's retaliation and negligent supervision causes of action and her claims for declaratory relief (retaliation) and punitive damages, but denying summary adjudication of her discrimination, harassment, and failure to take necessary steps to prevent discrimination and harassment, and wrongful termination in violation of public policy causes of action, and her claims for declaratory relief (discrimination) and injunctive relief.[4]

FACTUAL AND PROCEDURAL BACKGROUND[5]

The following facts are taken from the evidence set forth in the papers filed in connection with the summary judgment motion, except that to which objections were properly made and sustained. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.) Consistent with the applicable standard of review, we summarize the evidence in

---

[3]    The operative complaint also alleges causes of action for retaliation, negligent supervision, and declaratory relief (retaliation). The trial court granted summary judgment on those causes of action, and Galvan does not challenge that portion of the trial court's ruling on appeal.

[4]    This is one of six appeals pending before this court by former Dameron nursing employees who reported directly to Alvarez, alleging that they were discriminated against in violation of the FEHA. (See *Kabba v. Dameron Hospital Assn.*, C081090; *Ortiz v. Dameron Hospital Assn.*, C081091; *Arimboanga v. Dameron Hospital Assn.*, C081249; *Duke v. Dameron Hospital Assn.*, C081251; *Guiao v. Dameron Hospital Assn.*, C081755.)

[5]    Galvan's request for judicial notice filed April 7, 2017, is denied.

the light most favorable to Galvan, the party opposing summary judgment, resolving any doubts concerning the evidence in her favor.  (*Ibid.*)

Galvan is a registered nurse.  She was born in the Philippines and immigrated to the United States.  English is her second language, and she speaks it with a strong accent.  At the time of the conduct complained of herein, Galvan was 54 years old and had been working at Dameron Hospital for approximately 25 years.  During the last six years of her employment there, she held the position of unit coordinator in the medical-surgical department.  As a unit coordinator, Galvan was required to attend all unit coordinator and staff meetings.

In mid-2011, Alvarez became the director of the medical-surgical and telemetry departments at Dameron Hospital and Galvan's supervisor.  Like Galvan, the majority of unit coordinators in the medical-surgical and telemetry departments were Filipino.

Every time Alvarez met with the unit coordinators, she "insult[ed]," "degrade[ed]," and "humiliate[ed]" them.  At her first meeting with the unit coordinators, Alvarez brought the unit coordinators' personnel files to the meeting and stated that she had found "horrible" and "disgusting" things in the files.  She told them that she had already heard about them around the hospital, and that she was ready to "make a change."  She also stated that "she ha[d] eyes around the hospital" and whatever they said about her would get back to her.

Alvarez singled out unit coordinators who spoke English as a second language for criticism and often focused her comments on their accents and their supposed poor English language skills.  At one meeting, Alvarez told the unit coordinators, "I don't know how Dameron gets you guys.  Your accents are thick.  [You] don't know what [you're] doing."  She read from performance evaluations drafted by unidentified unit coordinators and criticized the drafters' grammar.  She stated that "those of you with a thick accent, those of you that cannot speak English . . . need to go back to school and

4

learn how to read and write grammar," and that her young son could write better than they could. She also advised them that she was there "to clean the house."

At another meeting, Alvarez introduced a new unit coordinator who was White, and told the other unit coordinators, "She speak[s] good English. She's well educated. She's going to do a better job [than] most of you guys here because you guys don't know how to speak English."

On more than one occasion, Alvarez told the unit coordinators that if they could not "handle it," they could "step up, step down or step out" and threw job openings in other departments on the table. She said that the unit coordinators were being paid "big bucks" and were not doing their jobs. She also told them that they did not know how to "formulate a sentence" or "how to put a comma or punctuation mark."

Alvarez's treatment of the unit coordinators got progressively "worse and worse and worse," and Galvan's "stress level [went] higher and higher." Alvarez "kept bombarding [the unit coordinators] with negative insults," and the work environment deteriorated. Galvan was afraid to speak up at the unit coordinator meetings; she became "sweaty, cold, [and] nervous" and her hands trembled.

In addition to the comments she made directly to the unit coordinators, Alvarez made disparaging comments about the unit coordinators to other employees at Dameron. Alvarez repeatedly told Bassey Duke, a clinical manager a Dameron Hospital who also reported to Alvarez, that the Filipino unit coordinators were "too old" and had "been here too long," and that she wanted to get rid of all of them. She singled out "Jackie [Arimboanga], Nancy [Ortiz], [and] Shirley [Galvan]" and "would mention things about them such that, they are old, dummy, can't think, can't stand them, been here for too long." Arimboanga and Ortiz, like Galvan, are Filipino, and English is their second language. Alvarez also told Duke, "These old Filipinos are making way too much money" and observed that they made "much more" money than she did. She spoke to Duke about the need to "get[] lean" in order to facilitate a merger between Dameron and

5

the University of California Davis Medical Center. At some point, Alvarez provided Duke with the names of individuals she wanted to get rid of, including Galvan, Arimboanga, Ortiz, and Ramatu Kabba (who had immigrated to the United States from Africa), because they were "dumb," "didn't speak English," "didn't represent the face of U.C. Davis," "ma[d]e too much money," and "were old." According to Duke, Alvarez's criticisms of the Filipino unit coordinators were ongoing and "constant."

Alvarez told Roman Roxas, a manager at Dameron with whom she shared an office for a time, that Filipinos were "stupid," she did not "know what they are saying half the time," and she did not "know how they got the job speaking the way they do."

On July 10, 2012, the unit coordinators in the medical-surgical and telemetry departments were given an exam to test their ability to read electrocardiograms (EKGs). The medical-surgical department where Galvan worked did not have EKG monitors. Alvarez told Duke that the Filipinos "didn't have enough brains to pass" the test. When Duke suggested providing a review class to help the unit coordinators prepare for the test, Alvarez responded, "Those Filipinos, they are old, they are too dumb. They don't have any brains to learn it anyway. Just let them take it because they're going to flunk so I can get rid of them." When Alvarez learned that Duke had referred the unit coordinators to a website to help them prepare, Alvarez told him that he should "stop helping them because by helping them, [he was] defeating the purpose of what she wants to do, which is to terminate them." Galvan and many other unit coordinators in the medical-surgical department failed the exam. A second test was given on July 20, 2012, and Galvan passed.

In August 2012, Alvarez terminated Duke. Following his termination, Duke told some of the unit coordinators that Alvarez was planning to terminate certain unit coordinators. On August 16, 2012, Galvan was told by two other employees that she was one of the nurses that Alvarez was planning to terminate. Galvan "lost it." She did not know what she had done to warrant being terminated. She was unable to sleep that night,

6

wondering, "What happened, why wasn't I worth it?"  The following day, she called in sick and went to see her doctor, who placed her on medical leave for stress and prescribed her medication to help "calm [her] down."  The leave began on August 17, 2012, and was extended a number of times through October 2013.

Meanwhile, in July 2012, Arimboanga was terminated after Alvarez reported that she had observed Arimboanga sleeping on the job, Ortiz resigned due to stress after Alvarez accused her of sleeping on the job, and Kabba went out on medical leave due to stress, which she attributed to working under Alvarez.

On October 5, 2012, Kabba sent a four-page letter to Dameron's human resources director Maria Junez complaining that Alvarez's "inappropriate and objectionable conduct" had resulted in "an extremely hostile work environment" and giving examples of such conduct.

On November 1, 2012, Deborah Piceno, a human resource specialist at Dameron, wrote to Galvan and informed her that she would exhaust her 12 weeks of job-protected leave on November 8, 2012, and effective November 9, 2012, she would be "removed from [her] position in the 2nd Floor East Department."  Piceno explained that while Galvan was not being terminated, she was not guaranteed the right to return to her former position or shift.  Piceno directed Galvan to contact her to discuss "potential ways of finding other employment . . . at the Hospital" when she was able to resume work.

When Galvan was ready to return to work, she did not apply for a job at Dameron because she was afraid she would be subjected to the same type of harassment and intimidation she was subjected to in the months before she went out on stress leave if she returned to the medical-surgical department, and she did not feel that she was qualified for a position in another department after spending 25 years in the medical-surgical department.

On February 17, 2014, after Galvan stopped responding to its letters, Dameron notified Galvan that it had terminated her employment effective immediately.

7

DISCUSSION

A motion for summary judgment must be granted if the submitted papers show there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) The moving party initially bears the burden of making a "prima facie showing of the nonexistence of any genuine issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 845.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Id.* at p. 851.) As applicable here, a defendant moving for summary judgment can meet its burden of showing that a cause of action has no merit by showing that one or more elements of the cause of action cannot be established. (Code Civ. Proc., § 437c, subd. (p)(2).) Once the defendant has met its burden, the burden shifts to the plaintiff to show that a triable issue of one or more material facts exists as to the cause of action. (*Ibid.*)

We review de novo the record and the determination of the trial court. First, we identify the issues raised by the pleadings, since it is those allegations to which the motion must respond. Second, we determine whether the moving party's showing has established facts negating the opponent's claims and justifying a judgment in the moving party's favor. When a summary judgment motion prima facie justifies a judgment, the final step is to determine whether the opposition demonstrates the existence of a triable, material issue of fact. (*Barclay v. Jesse M. Lange Distributor, Inc.* (2005) 129 Cal.App.4th 281, 290.)

I

The Trial Court Erred in Granting Summary Judgment on Galvan's Discrimination
Cause of Action

Under the FEHA, it is unlawful for an employer, because of a protected classification, to discriminate against an employee "in compensation or in terms, conditions, or privileges of employment." (§ 12940, subd. (a).) To state a prima facie

8

case for discrimination in violation of the FEHA, a plaintiff must establish that (1) she was a member of a protected class, (2) she was performing competently in the position she held, (3) she suffered an adverse employment action, and (4) some other circumstance suggests discriminatory motive. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355.) Once an employee establishes a prima facie case, a presumption of discrimination arises, and the employer is required to offer a legitimate, nondiscriminatory reason for the adverse employment action. (*Id.* at pp. 355-356.) If the employer produces a legitimate, nondiscriminatory reason for the adverse employment action, the presumption of discrimination drops out of the picture, and the burden shifts back to the employee "to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive." (*Id.* at p. 356.)

This framework is modified in the summary judgment context: " '[T]he employer, as the moving party, has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors.' " (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 861.) "If the employer meets its initial burden, the burden shifts to the employee to 'demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory *animus*, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action.' " (*Ibid.*)

Here, the trial court determined that Galvan could not establish the third (adverse employment action) or fourth (discriminatory motive) elements of a prima facie case of discrimination. The trial court found that because Galvan "has not shown that Dameron, her employer, knew about Alvarez's actions and failed to remedy them," Galvan "cannot establish that she was constructively terminated and therefore suffered an adverse employment action. The court also determined that "[t]here is simply no nexus between

9

Alvarez's alleged discriminatory conduct and Dameron's actions." On appeal, Galvan argues that the trial court erred in granting summary judgment on her discrimination cause of action because there are disputed factual issues about whether she was constructively discharged and whether Dameron acted with a discriminatory motive. We agree.[6]

A.     *Galvan Presented Evidence That Would Allow a Reasonable Trier of Fact to Find That She Was Constructively Discharged*

"In an attempt to avoid liability [for wrongfully discharging an employee], an employer may refrain from actually firing an employee, preferring instead to engage in conduct causing him or her to quit. The doctrine of constructive discharge addresses such employer-attempted 'end runs' around wrongful discharge and other claims requiring employer-initiated terminations of employment. [¶] . . . [¶] Constructive discharge occurs when the employer's conduct effectively forces an employee to resign. Although the employee may say, 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation. [Citation.]" (*Turner v. Anheuser-Busch, Inc*. (1994) 7 Cal.4th 1238, 1244-1245 (*Turner*).)

"In order to establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer *either* intentionally created *or* knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign. [¶] For purposes of this standard, the requisite knowledge or intent must exist on the part

---

[6]     We shall assume for purposes of appeal that defendants presented admissible evidence showing either that one or more elements of Galvan's prima facie case is lacking. (*Serri v. Santa Clara University, supra,* 226 Cal.App.4th at p. 861.)

10

of either the employer or those persons who effectively represent the employer, i.e., its officers, directors, managing agents, or supervisory employees." (*Turner, supra,* 7 Cal.4th at p. 1251, italics added.)

"In order to amount to a constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." (*Turner, supra,* 7 Cal.4th at p. 1247, fn. omitted.)

Contrary to the trial court's ruling and defendants' assertion on appeal, Galvan was not required to show that Dameron knew of Alvarez's conduct prior to Galvan going out on medical leave in order to establish she was constructively discharged. In *Turner,* the court made plain that an employee seeking to establish a constructive discharge must show that the employer *either* intentionally created *or* knowingly permitted the intolerable working conditions, and that the intent or knowledge must exist on the part of the employer *or those persons who effectively represent the employer, including supervisory employees.* (*Turner, supra*, 7 Cal.4th at p. 1251.) Here, Galvan presented evidence that would allow a reasonable trier of fact to conclude that Alvarez, a supervisory employee, intentionally created the working conditions at issue here, and that a reasonable person faced with those conditions would have felt compelled to leave.

Alvarez's status as a supervisory employee is undisputed. The FEHA defines "supervisor" as "any individual having the authority . . . to . . . transfer, suspend, . . . promote, discharge, assign, reward, or discipline other employees, . . . or effectively to recommend that action . . . ." (§ 12926, subd. (t).) As the director of the medical-surgical and telemetry departments, Alvarez had such authority. As for the working conditions, Galvan produced evidence that after Alvarez became the director of the medical-surgical department in mid-2011, she consistently demeaned Galvan and the other unit coordinators, the vast majority of whom were Filipino, accusing those with thick accents of not being able to speak English, telling them that they did not know what they were doing and that they needed to go back to school, and comparing them

11

unfavorably to her young son. She told them that they did not know how to formulate a sentence and said that her young son could write better than they could. She warned them that she "ha[d] eyes all over the hospital" and told them that she was there to "clean the house." She attempted to humiliate them in front of a new unit coordinator by telling them that the new unit coordinator would do a better job than most of them because they did not know how to speak English. She gave the unit coordinators, including Galvan, an EKG exam without any prior notice, knowing they would likely fail and many, including Galvan, did. She also told Duke that she planned to terminate Galvan and several other foreign-born unit coordinators, including Galvan, and word of her plan made its way back to Galvan. Less than three weeks before Galvan went out on medical leave, Arimboanga was fired, Ortiz resigned due to stress, and Kabba went out on stress leave. Like Galvan, Arimboanga and Ortiz are Filipino, and Kabba immigrated to the United States from Africa. All were foreign-born unit coordinators who worked under Alvarez. Based on the evidence presented, a reasonable trier of fact could conclude that a reasonable person in Galvan's position would have felt compelled to go out on leave and not return.

Defendants take issue with Galvan's reliance on the testimony of other unit coordinators describing Alvarez's conduct at the unit coordinator meetings, arguing that "Galvan presents no evidence that she heard, saw, or otherwise knew of the experiences of the other employees." We disagree. Galvan presented evidence that she was required to attend all unit coordinator meetings, and her testimony indicated that she did so. When asked, "[W]hat are the events which occurred at Dameron which contributed to your stress requiring you to take that leave?," Galvan responded, "It all happened during our unit coordinator meeting[s]." She explained that "[e]very time [they had] a unit coordinator meeting," her stress level went "higher and higher" until she reached a point where she "couldn't take it anymore." Each unit coordinator meeting, Alvarez's conduct got "worse and worse and worse." Based on this evidence, a reasonable trier of fact

could infer that Galvan was present at all the unit coordinator meetings and heard the comments and observed the conduct described by the other unit coordinators.

Defendants also assert that Galvan's medical leave was not "attributable to either Alvarez or Dameron" because "Galvan testified that she took the leave because her *coworkers* told her an unsubstantiated rumor about being on a supposed list of impending terminations." Again, we disagree. Galvan's testimony makes plain that her medical leave was attributable to Alvarez's comments and conduct at the unit coordinator meetings and that learning that Alvarez intended to terminate her was simply the last straw. While defendants seek to disassociate themselves from the information that Alvarez intended to terminate Galvan by characterizing it as an "unsubstantiated rumor," Galvan had reason to believe the information was true. In the weeks before she was told that she was "one of the nurses that Mrs. Alvarez [was] going to terminate," three other nurses who were supervised by Alvarez—Arimboanga, Ortiz, and Kabba—had been fired or left due to stress. Arimboanga was terminated after Alvarez reported that she had observed Arimboanga sleeping on the job, Ortiz resigned due to stress after Alvarez accused her of sleeping on the job, and Kabba went out on medical leave due to stress, which she attributed to working under Alvarez. Under these circumstances, a reasonable trier of fact could find that Galvan had reason to believe her coworkers when they told her that Alvarez planned to terminate her.[7]

---

[7] Because we conclude that Galvan presented evidence sufficient to raise a triable issue as to whether she was constructively discharged, we need not consider her alternative argument that the evidence showed that she suffered an adverse employment action even if she was not constructively discharged.

*B.*     *Galvan Presented Sufficient Evidence to Allow a Reasonable Trier of Fact to Find That Alvarez Acted With a Discriminatory Motive, and That There Was a Nexus Between Alvarez's Conduct and Galvan's Protected Status*

Galvan presented ample evidence that Alvarez acted with a discriminatory motive, and that there was a nexus between Galvan's protected status and Alvarez's actions. Alvarez focused her criticisms on the unit coordinators' accents and supposed poor English language skills. Discrimination on the basis of an employee's foreign accent is a sufficient basis for finding national origin discrimination. (*Fragante v. Honolulu* (9th Cir. 1989) 888 F.2d 591, 595; *Berke v. Ohio Dept. of Public Welfare* (6th Cir. 1980) 628 F.2d 980, 981.) Indeed, the Equal Employment Opportunity Guidelines currently "define[] national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural, or *linguistic characteristics* of a national origin group." (29 C.F.R. § 1606.1 (2019), italics added.) Galvan also presented evidence that Alvarez told Roxas that the Filipinos were "stupid," she could not understand what they were saying, and did not know how they got their jobs "speaking the way they do." Alvarez made similar statements to Duke and also invoked the unit coordinators' ages. She told Duke that the Filipino unit coordinators were "too old and had been here too long," and that she wanted to get rid of the Filipino unit coordinators, including Galvan, because they were "dumb," "didn't speak English," "didn't represent the face of U.C. Davis," and "ma[d]e too much money."

To the extent the trial court found that Galvan must show that Dameron, as opposed to Alvarez, acted with a discriminatory motive, it erred. The FEHA's statutory definition of "employer" includes "persons acting as an agent of an employer." (§ 12926, subd. (d).) This definition was intended " 'to ensure that *employers* will be held liable if their supervisory employees take actions later found discriminatory.' " (*Reno v. Baird* (1998) 18 Cal.4th 640, 647.) As previously discussed, Alvarez is a supervisory employee. Moreover, where, as here, the adverse action is a constructive discharge that

14

is alleged to have resulted from the intentional acts of a supervisory employee, it is the discriminatory intent of the supervisory employee that is at issue. (*Turner, supra,* 7 Cal.4th at p. 1251.)

For all the foregoing reasons, the trial court erred in granting summary judgment on Galvan's discrimination cause of action.

II

## The Trial Court Erred in Granting Summary Judgment on Galvan's Harassment Cause of Action

It is an unlawful employment practice under the FEHA for an employer to harass an employee because of national origin or age. (§ 12940, subd. (j)(1).) To establish a prima facie case of harassment, Galvan must show that (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her protected status; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) defendants are liable for the harassment. (*Thompson v. City of Monrovia* (2010) 186 Cal.App.4th 860, 876.) Here, the trial court ruled that "[d]efendants have shown that [Galvan] cannot establish each essential element of her claim for harassment." More particularly, the trial court found that there is nothing to indicate that any of Alvarez's conduct was based on Galvan's national origin or age because it was directed to all the unit coordinators, and Alvarez's statements to Roxas and Duke were not relevant to Galvan's harassment cause of action because she did not know about them. On appeal, Galvan contends that "[t]here are disputed factual issues about whether Alvarez harassed [Galvan] and others because of their national origin and age." We agree.

A.    *Galvan Presented Evidence That Would Allow a Reasonable Trier of Fact to Find That Alvarez's Conduct Was Motivated by Galvan's National Origin and Age*

As previously discussed in connection with Galvan's discrimination cause of action, Galvan presented evidence that would allow a reasonable trier of fact to find that

15

Alvarez's conduct was based on Galvan's and the other Filipino and foreign-born unit coordinators' national origin and age. While Alvarez's statements to Roxas and Duke are not relevant to the issue of whether Galvan was subjected to unwelcome harassment insofar as she was unaware of such statements when she went out on leave, those statements are relevant to the issue of whether Alvarez's conduct was motivated by Galvan and the other Filipino and foreign-born unit coordinators' protected status. Those statements, coupled with Alvarez's criticisms of the unit coordinators' accents, are sufficient to raise a triable issue of material fact as to whether Alvarez's treatment of Galvan and the other Filipino and foreign-born unit coordinators was motivated by their national origin and age.

B.    *Galvan Presented Evidence That Would Allow a Reasonable Trier of Fact to Find That She Was Subjected to Severe and Pervasive Treatment*

Defendants assert that "Alvarez's alleged animus toward Galvan is irrelevant without a showing that Galvan experienced severe or pervasive treatment." According to defendants, the trial court's judgment should be affirmed as to Galvan's harassment cause of action because Galvan cannot prove that the complained of conduct was severe or pervasive. We are not persuaded.

"[A]n employee claiming harassment based upon a hostile work environment must demonstrate that the conduct complained of was severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their [protected status]." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462.) "The harassment cannot be occasional, isolated, sporadic, or trivial; the plaintiff must show a " 'concerted pattern of harassment of a repeated, routine or a generalized nature." ' " (*Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1377-1378, citing *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 131.) Moreover, "[t]he harassment must satisfy an objective and a subjective standard. ' "[T]he objective severity of

16

harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' . . . " ' (*Miller v. Department of Corrections*, *supra*, 36 Cal.4th at p. 462.) And, subjectively, an employee must perceive the work environment to be hostile. [Citation.] Put another way, '[t]he plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee and that [she] was actually offended.' [Citation.]" (*Hope v. California Youth Authority* (2005) 134 Cal.App.4th 577, 588-589.)

As a preliminary matter, we reject defendants' assertion that Galvan is precluded from relying on the testimony of other unit coordinators to show that she was subjected to a hostile work environment. As detailed above, Galvan presented evidence that would allow a reasonable trier of fact to find that she was present at all the unit coordinator meetings and heard the comments and observed the conduct described by the other unit coordinators.

Turning to the merits, we have already concluded that Galvan presented evidence that would allow a reasonable trier of fact to find that a reasonable person in Galvan's position would have felt compelled to go out on leave and not return, and Galvan testified that she "felt forced out of [her] position because of the environment and the anxiety that [it] produced for [her]." Moreover, Galvan presented evidence that would allow a reasonable trier of fact to find that she and the other Filipino and foreign-born unit coordinators were subjected to a " 'concerted pattern of harassment of a repeated or generalized nature.' " (*Jones v. Department of Corrections & Rehabilitation, supra,* 152 Cal.App.4th at p. 1378.) Every time Alvarez met with the unit coordinators, she "insult[ed]," "degrad[ed], and "humiliat[ed] them." She consistently criticized the unit coordinators' accents and English language skills and "kept bombarding" them with negative insults. Based on the evidence presented, a reasonable trier of fact could conclude that the conduct complained of was sufficiently severe or pervasive to interfere

17

with a reasonable employee's work performance and seriously affect the psychological well-being of a reasonable employee.

Accordingly, the trial court erred in granting summary judgment on Galvan's harassment cause of action.

## III

### The Trial Court Erred in Granting Summary Judgment on Galvan's Failure to Take Necessary Steps to Prevent Discrimination and Harassment Cause of Action

Under the FEHA, it is unlawful for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." (§ 12940, subd. (k).) The trial court granted summary judgment on Galvan's failure to take necessary steps to prevent harassment and discrimination cause of action on the ground that no such action lies if no harassment or discrimination has occurred. (See *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289 ["Employers should not be held liable to employees for failure to take necessary steps to prevent such conduct, except where the actions took place and were not prevented"]; see also Cal. Code Regs., tit. 2, § 11023, subd. (a)(2).) As detailed above, we conclude that Galvan submitted evidence sufficient to create a triable issue of material fact as to whether harassment and discrimination occurred. Thus, the basis for the trial court's ruling is no longer valid.

It is well settled, however, that on appeal following summary judgment, the trial court's reasoning is irrelevant, and the matter is reviewed on appeal de novo. (*Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 140.) "We exercise our independent judgment as to the legal effect of the undisputed facts [citation] and must affirm on any ground supported by the record." (*Ibid.*) Defendants contend that summary judgment was properly granted on the failure to prevent discrimination and harassment cause of action because "Dameron submitted evidence of its efforts to prevent discrimination and harassment." In support of their contention, defendants assert: "Galvan received copies of Dameron's employee handbook which contained its anti-discrimination and anti-

18

harassment policies. Dameron's Corporate Compliance Code of Conduct contains guidelines and a hotline for reporting suspected unlawful activity and its commitment to maintain a work environment free from discrimination. Dameron further posted anti-discrimination and retaliation posters required by the FEHA in conspicuous locations."

Determining whether an employee has complied with section 12940, subdivision (k) includes an individualized assessment based on numerous factors such as workforce size, budget, and nature of its business, as well as the facts of a particular case. (Cal. Code Regs., tit. 2, § 11023, subd. (a)(1).) Defendants' evidence, while relevant, fails to show that Galvan's failure to prevent discrimination and harassment cause of action has no merit. (Code Civ. Proc., § 437c, subd. (p)(2).) Accordingly, the trial court erred in granting summary judgment on this cause of action as well.

IV

The Trial Court Erred in Granting Summary Judgment on Galvan's Wrongful Termination in Violation of Public Policy Cause of Action

The trial court granted summary judgment on Galvan's wrongful termination in violation of public policy cause of action on the ground that Galvan "bases the claim on age and race/national origin discrimination," and "[d]efendants have shown [Galvan] cannot establish her claims of discrimination." Galvan appeals, contending that because the court erred in granting summary judgment on her FEHA causes of action, it also erred in granting summary judgment on her wrongful termination in violation of public policy cause of action. We agree.

"[A]n employer's traditional broad authority to discharge an at-will employee 'may be limited by statute . . . or by considerations of public policy.'" (*Tameny v. Atlantic Richfield Co., Inc.* (1980) 27 Cal.3d 167, 172 (*Tameny*).) In *Tameny,* the court held that an employee discharged for refusing to engage in illegal conduct at his employer's request may bring a tort action for wrongful discharge. The court reasoned that "the relevant authorities both in California and throughout the country establish that

19

when an employer's discharge of an employee violates fundamental principles of public policy, the discharged employee may maintain a tort action and recover damages traditionally available in such actions." (*Id.* at p. 170.) "[C]ourts in *wrongful discharge actions* may not declare public policy without a basis in either constitutional or statutory provisions. A public policy exception carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions strikes the proper balance among the interests of employers, employees and the public." (*Gantt v. Sentry Insurance* (1992) Cal.4th 1083, 1095.)

"The FEHA is a statute which clearly states a public policy against discrimination on the basis of age [and national origin] in employment." (*Jennings v. Marralle* (1994) 8 Cal.4th 121, 130.) Accordingly, the trial court erred in granting summary judgment on Galvan's wrongful termination in violation of public policy cause of action.

V

The Trial Court Erred in Granting Summary Judgment on Galvan's Declaratory Relief (Discrimination) and Injunctive Relief Claims

The trial court granted summary judgment on Galvan's declaratory relief (discrimination) and injunctive relief claims on the ground that they are derivative of the other cause of action which it found could not survive summary judgment. On appeal, Galvan contends that "[s]ince the underlying causes of action should have survived, so must the claims for declaratory and injunctive relief." We agree.

We have concluded that summary judgment was improperly granted on Galvan's discrimination and harassment causes of action. As defendants acknowledge, " '[U]pon a finding of unlawful discrimination, a court may grant injunctive relief where appropriate to stop discriminatory practices.' " (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 234.) The same is true with respect to declaratory relief. "[P]roof that an adverse employment decision was substantially motivated by discrimination may warrant a judicial declaration of employer wrongdoing." (*Ibid.*) Accordingly, we conclude that the

20

trial court erred in granting summary judgment on Galvan's declaratory relief (discrimination) and injunctive relief claims.

## VI

## Summary Judgment Was Properly Entered on Galvan's Claim for Punitive Damages

Civil Code section 3294, subdivision (a) provides: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." Subdivision (b) of that section states: "An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her in conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. *With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation.*" (Italics added.) A managing agent is "someone who exercises substantial discretionary authority over decisions that ultimately determine corporate policy." (*White v. Ultramar* (1999) 21 Cal.4th 563, 573 (*White*).)

Here, the trial court determined that "[s]ince none of [Galvan's] causes of action survive this motion, she will not be able to prove or receive actual damages," so punitive damages are likewise unavailable. We have concluded that a number of Galvan's causes of action shall survive summary judgment, including her discrimination, harassment, and wrongful termination in violation of public policy causes of action. Accordingly, the basis for the trial court's ruling is no longer valid. As detailed above, however, we may affirm on any ground supported by the record. (*Jimenez v. County of Los Angeles, supra,* 130 Cal.App.4th at p. 140.)

21

Defendants argued below that summary judgment of Galvan's request for punitive damages is appropriate because "none of the alleged wrongdoers named in Plaintiff's complaint were managing agents for defendant [Dameron]." Among other things, defendants presented evidence that neither Alvarez nor Junez "autonomously set policy for Dameron Hospital Association," Alvarez did not "exercise substantial independent authority over a significant portion of [Dameron's] business," and Junez "only exercises discretion and authority within Human Resources under the oversight of the Vice-President of Human Resources." In response, Galvan failed to point to any evidence that would support a finding that Alvarez or Junez were managing agents. Rather, Galvan asserted that "[w]hether Ms. Alvarez's level of authority raises to the level of managing agent or that her conduct was ratified by Defendant, for purposes of punitive damages, is for a jury to determine based on the facts." In the context of a summary judgment motion, where, as here, the defendant made a prima facie showing that the plaintiff cannot establish an element of the cause of action, Galvan was required to produce evidence sufficient to create a triable issue of material fact. She failed to do so.

As for Junez, Galvan cited to Junez's "overall role in terminations, investigations and oversight." Such evidence is insufficient to create a triable issue on whether Junez was a managing agent.[8] "[S]upervisors who have no discretionary authority over decisions that ultimately determine corporate policy would not be considered managing agents even though they may have the ability to hire or fire other employees. In order to demonstrate that an employee is a true managing agent under [Civil Code] section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the

---

[8]     Galvan also asserted generally that "Junez testified to her direct involvement in drafting policies and procedures." The evidence cited, however, does not support her assertion. In any event, having direct involvement in drafting unspecified policies and procedures is insufficient to show that someone is a managing agent. (*White, supra,* 21 Cal.4th at pp. 573, 577.)

employee exercised substantial discretionary authority over significant aspects of a corporation's business." (*White, supra,* 21 Cal.4th at p. 577.) Galvan failed to produce evidence that would allow a reasonable trier of fact to conclude that Junez exercised such authority. Accordingly, the trial court properly granted summary judgment on Galvan's claim for punitive damages.

## VII

### The Trial Court Abused Its Discretion in Excluding Evidence of Statements Made by Alvarez Concerning Galvan and the Other Unit Coordinators

The trial court sustained without explanation 54 of defendants' 112 objections to Galvan's evidence. On appeal, Galvan challenges the trial court's ruling as to 28 of those objections. Defendants fail to respond individually to Galvan's contentions; rather, they respond generally that "even if the trial court had admitted the evidence to which it sustained objections, it would not have affected the outcome of the motion for summary judgment because Galvan cannot demonstrate adverse employment action or severe or pervasive treatment." Much of the evidence that is the subject of the challenged rulings is not material to the resolution of the issues raised on appeal. We shall limit our review to the evidentiary rulings that pertain to evidence that is material to our resolution of the issues raised on appeal and shall review those rulings for an abuse of discretion. (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.)

The trial court sustained defendants' objection Nos. 55 and 56 to paragraphs 14 and 17 of Galvan's declaration in which she states her reasons for taking medical leave and her belief that she was "forced out of [her] position because of the environment and the anxiety that [it] produced for [her]." Defendants objected to this evidence on relevance, improper opinion, and foundational grounds. Galvan's reasons for taking medical leave and her belief that she was forced out are relevant to the issue of whether she was subjected to a hostile work environment. (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 284 ["plaintiff who does not perceive the workplace

23

as hostile or abusive will not prevail, even if it objectively is so"].) Galvan is competent to testify as to why she took a medical leave and to her belief that she felt forced to do so due to her work environment. Such evidence does not constitute improper opinion and does not lack foundation. The trial court abused its discretion in sustaining defendants' objections thereto.

## DISPOSITION

The judgment is reversed. The trial court is directed to vacate its order granting the motion for summary judgment and to enter a new order granting the motion for summary adjudication as to the retaliation and negligent supervision causes of action and the claims for declaratory relief (retaliation) and punitive damages, but denying the motion for summary adjudication as to the discrimination, harassment, failure to take necessary steps to prevent discrimination and harassment, and wrongful termination in violation of public policy causes of action, and the claims for declaratory relief (discrimination) and injunctive relief. In light of our rulings in this and several other appeals by former Dameron nursing employees who reported directly to Alvarez, we further direct the trial court to reassign this matter to a different judge. Galvan shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

                                                            /s/
                                                     BLEASE, Acting P. J.

We concur:

    /s/
ROBIE, J.

    /s/
DUARTE, J.

Filed 7/17/19

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| SHIRLEY GALVAN, | C081092 |
| Plaintiff and Appellant, | (Super. Ct. No. 39201400308392CUOESTK, STKCVUOE20140002183) |
| v. | |
| DAMERON HOSPITAL ASSOCIATION et al., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Respondents. | [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed June 20, 2019, was not certified for publication in the Official Reports. For good cause it appears now that the opinion should be published in the Official Reports and it is so ordered.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts III to VI of the Discussion.

1

# EDITORIAL LISTING

APPEAL from a judgment of the Superior Court of San Joaquin County, Carter P. Holly, Judge.  Reversed.

Law Offices of Ellen Lake and Ellen Lake; Bohbot & Riles and Karine Bohbot for Plaintiff and Appellant.

Kennaday Leavitt Owensby, Jeffery Owensby, Warren F. Hodges for Defendants and Respondents.


BY THE COURT:


_____/s/_____
BLEASE, Acting P. J.


_____/s/_____
ROBIE, J.


_____/s/_____
DUARTE, J.

2