Filed 8/25/23  Robinson v. City of Vallejo CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| TY ROBINSON,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CITY OF VALLEJO,<br><br>        Defendant and Respondent. | A165551<br><br>(Solano County<br>Super. Ct. No.<br>FCS055466) |

Plaintiff Ty Robinson, an African-American woman, filed an action against her employer, the City of Vallejo, for race discrimination, harassment, and failure to prevent discrimination and harassment under the Fair Employment and Housing Act (FEHA).  (Gov. Code, § 12940 et seq.[1])  The trial court sustained the City's demurrer to plaintiff's second amended complaint without leave to amend and dismissed the action.

We reverse.

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

1

Plaintiff began her employment with the city in July 2009 as an analyst in the Public Works Department.

In 2014, she filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging discrimination and harassment.[3] The following year, in August 2015, she resigned.

Five years later, in January 2020, the EEOC and the Department of Fair Employment and Housing (now the Civil Rights Department) issued a letter to plaintiff stating she had "exhaust[ed] her administrative remedies and allowing her the right to sue."

Nine months later, she filed a complaint against the city, alleging "wrongful termination on the basis of race pursuant to Government Code [section] 12940(a) and failure to prevent discrimination and harassment pursuant to Government Code [section] 12490(i)." After the parties met and conferred, plaintiff filed a first amended complaint.

---

[2] Because this is an appeal from an order of dismissal following the sustaining of a demurrer without leave to amend, the underlying facts pertaining to plaintiff's claims are drawn from her complaint. Here, we provide only a very brief overview of the case and discuss plaintiff's allegations in detail in connection with our discussion of the issues on appeal.

[3] In its trial court memoranda, the city did not confine itself to the facts as alleged in plaintiff's pleadings and made additional factual assertions, including about the EEOC complaint and investigation. Had the city sought, and the trial court taken, judicial notice of matters establishing such facts that would have been proper. (See *Smyth v. Berman* (2019) 31 Cal.App.5th 183, 191.) But the city did not do so. Accordingly, its assertion of such facts was improper in the trial court, and likewise is improper on appeal. (See *Big Valley Band of Pomo Indians v. Superior Court* (2005) 133 Cal.App.4th 1185, 1190 [where matters have not been judicially noticed in connection with demurrer "[i]t is well settled that evidentiary matters outside the complaint may not be considered upon such a review"].)

In her four-page first amended complaint, plaintiff again alleged employment discrimination on the basis of race and failure to prevent discrimination and harassment in violation of the Fair Employment and Housing Act (FEHA).

The city demurred, contending plaintiff's allegations did not demonstrate she had "suffered any adverse employment action" materially affecting the terms and conditions of her employment or that she had been subjected to an abusive working "environment 'permeated with discriminatory intimidation, ridicule, and insult.'"

At the hearing on the demurrer, the trial court stated plaintiff's "allegations in the complaint, both the first and the first amended complaint, are so bare bones as to be virtually incomprehensible. You continue to refer to inferences, reasonable inferences, but the court can't infer anything from this except that something happened. I don't know what it was. I don't know when it happened. I don't know who did it."

The court concluded plaintiff had "not alleged facts establishing that she was subject to any adverse employment action based on her race." Although plaintiff alleged "a few discrete occurrences over the course of her six years of employment as examples of discrimination," she had done so "without making any attempt to demonstrate that the conduct materially affected the terms, conditions, or privileges of her employment and without alleging how the acts resulted in any substantial and tangible harm." The court adopted its tentative ruling sustaining the demurrer but allowed plaintiff to file an amended pleading.

Plaintiff filed a 10-page second amended complaint alleging four counts: (1) race discrimination (§ 12940, subd. (a)); (2) harassment (*id.*, subd. (j)); (3) failure to prevent discrimination and harassment (*id.*, subd. (k)); and

3

(4) retaliation (*id.,* subd. (i)).[4]  She alleged she was subjected to "disparate treatment" and "harassment" by her supervisors and coworkers, which "was not subsequently corrected" and as a result she was subjected to "intimidating, unreasonably abusive, offensive, hostile, humiliating, and altered working conditions as to make it more difficult to do her job."

The city again demurred on the ground none of plaintiff's allegations "state a cause of action for race discrimination, harassment, or retaliation." Specifically, respondent maintained none of the allegations "demonstrate that Plaintiff suffered any adverse employment action materially affecting the terms and conditions of her employment" or that she "was subjected to an abusive working environment permeated with discriminatory intimidation, ridicule, and insult."

The trial court sustained the demurrer without leave to amend.  It first ruled plaintiff had "improperly added a cause of action for harassment and a cause of action for retaliation that were not alleged in the first amended complaint."  It next ruled she still had not alleged how the complained of conduct "materially affected the terms, conditions or privileges of employment to be deemed adverse employment actions."  Her new allegations did "not address how [the alleged acts] individually, or when considered together with prior allegations, materially affected the terms, conditions or privileges of employment to be deemed adverse employment actions . . . or made working conditions so intolerable or aggravated at the time of plaintiff's resignation that a reasonable employer would know that a reasonable person in Plaintiff's position would have been compelled to resign necessary to establish constructive discharge."

---

[4]  Plaintiff has not pursued her retaliation claim on appeal.

4

### *Discrimination on the Basis of Race*

The FEHA makes it unlawful for an employer to discharge a person from employment or "to discriminate against the person in compensation or in terms, conditions, or privileges of employment" on the basis of the person's race. (§ 12940, subd. (a).) There are generally two ways to prove such discrimination: disparate treatment and disparate impact. (*Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1379.)

Disparate treatment, as plaintiff has alleged here, "is *intentional* discrimination against one or more persons on prohibited grounds." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354, fn. 20 (*Guz*).) Such treatment can be shown through either direct or indirect evidence. Indeed, in most cases there is no direct evidence of discrimination by the employer. Thus, California courts have "adopted the three-stage burden shifting test established by the United States Supreme Court," in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*), "for trying claims of

---

[5] When reviewing an order sustaining a demurrer, we independently determine whether the facts alleged in the complaint are sufficient to state a cause of action. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.) "If the complaint states a cause of action under any theory, regardless of the title under which the factual basis for relief is stated, that aspect of the complaint is good against a demurrer." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38.) When a demurrer "is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment; if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) The burden of proving such reasonable possibility is squarely on the plaintiff. (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43.)

discrimination, including [race] discrimination, based on a theory of disparate treatment." (*Guz*, at p. 354.)

As relevant here, "the *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination. This step is designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified, or where the job he sought was withdrawn and never filled. [Citations.] While the plaintiff's prima facie burden is 'not onerous' [citation], he must at least show ' "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a [prohibited] discriminatory criterion. . . .' " ' " (*Guz, supra*, 24 Cal.4th at pp. 354–355.)

Generally, to make a prima facie case of discrimination, the plaintiff "must provide evidence that (1) he [or she] was a member of a protected class, (2) he [or she] was qualified for the position he sought or was performing competently in the position he [or she] held, (3) he [or she] suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz, supra*, 24 Cal.4th at p. 355.)

The parties and the trial court here focused on the second requirement—an adverse employment action.

There is no dispute that a cause of action for discrimination under the FEHA requires, as an element, an "adverse employment action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1050–1051 (*Yanowitz*); *Guz, supra*, 24 Cal.4th at p. 355.) This requirement "must be interpreted broadly to further the fundamental antidiscrimination purposes of the FEHA. Appropriately viewed, this provision protects an employee against unlawful

6

discrimination with respect not only to so-called ultimate employment actions such as termination or demotion, but also the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career." (*Yanowitz,* at pp. 1053–1054, fn. omitted.)

"[T]he determination of what type of adverse treatment properly should be considered discrimination in the terms, conditions, or privileges of employment is not, by its nature, susceptible to a mathematically precise test, and the significance of particular types of adverse actions must be evaluated by taking into account the legitimate interest of both the employer and the employee. Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reason of the antidiscrimination provision[] of section[] 12940(a). . . ." (*Yanowitz, supra,* 36 Cal.4th at pp. 1054–1055.) Allegations of mere "commonplace indignities typical of the workplace" do not establish an adverse employment action. (*Id.* at p. 1060.)

It is also important to point out that under the FEHA, the term "adverse employment action" has the same meaning in connection with both discrimination and retaliation claims. Indeed, this was the specific holding of *Yanowitz,* in which the high court was asked to decide whether the meaning of the phrase as elaborated in discrimination cases applied to retaliation cases, or whether in the latter context, the phrase has a broader meaning.

7

(*Yanowitz, supra,* 36 Cal.4th at pp. 1035–1036, 1049–1050.)  The court concluded that "[w]hen the provisions of section 12940 are viewed as a whole . . . it is more reasonable to conclude that the Legislature intended to extend a comparable degree of protection both to employees who are subject to the types of basic forms of discrimination at which the FEHA is directed—that is, for example, discrimination on the basis of race or sex—and to employees who are discriminated against in retaliation for opposing such discrimination, rather than to interpret the statutory scheme as affording a greater degree of protection against improper retaliation than is afforded against direct discrimination." (*Id.* at pp. 1049–1050.)

At the time *Yanowitz* was decided, this was also the majority view of the federal courts as to title VII's antidiscrimination and antiretaliation provisions.  (*Yanowitz, supra,* 36 Cal.4th at p. 1051.)  The following year, the United States Supreme Court held that a broader definition of adverse employment action applies in the context of title VII retaliation claims—namely, it encompasses actions that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." (*Burlington Northern and Santa Fe Ry. Co. v. White* (2006) 548 U.S. 53, 57.)  Our Supreme Court has not, however, reconsidered its decision in *Yanowitz* and we are, of course, bound by it.

With this legal backdrop in mind, we consider plaintiff's assertion that "harassment is actionable under a discrimination cause of action" and therefore her allegations of harassment suffice to allege an adverse employment action for purposes of a race discrimination claim.  She cites to two provisions of title 2 of the California Code of Regulations.  The first is title 2 of the California Code of Regulations section 11009, which addresses respondeat superior liability on the part of employers for conduct by

8

managerial and supervisory employees.[6]  The second is title 2 of the California Code of Regulations section 11008, subdivision (g)(3), which is one component of the general definition of "employment benefit."[7]  On the basis of

    [6]  California Code of Regulations, title 2, section 11009, subdivision (b) titled "Principles of Employment Discrimination"—"Liability of Employers" provides, "In view of the common law theory of respondeat superior and its codification in California Civil Code section 2338, an employer or other covered entity shall be liable for the discriminatory actions of its supervisors, managers or agents committed within the scope of their employment or relationship with the covered entity or, as defined in section 11019(b), for the discriminatory actions of its employees where it is demonstrated that, as a result of any such discriminatory action, the applicant or employee has suffered a loss of or has been denied an employment benefit."

    California Code of Regulations, title 2, section 11009, subdivision (c) provides, "Discrimination is established if a preponderance of the evidence demonstrates that an enumerated basis was a substantial motivating factor in the denial of an employment benefit to that individual by the employer or other covered entity, and the denial is not justified by a permissible defense. This standard applies only to claims of discrimination on a basis enumerated in Government Code section 12940, subdivision (a), and to claims of retaliation under Government Code section 12940, subdivision (h).  This standard does not apply to other practices made unlawful by the Fair Employment and Housing Act, including but not limited to, harassment. . . . A substantial factor motivating the denial of the employment benefit is a factor that a reasonable person would consider to have contributed to the denial.  It must be more than a remote or trivial factor.  It does not have to be the only cause of the denial."

    [7]  California Code of Regulations, title 2, section 11008 is a definitional provision; subdivision (g) defines " 'Employment Benefit' " as including, "[e]xcept as otherwise provided in the Act, any benefit of employment covered by the Act, including hiring, employment, promotion, selection for training programs leading to employment or promotions, freedom from disbarment[] or discharge from employment or a training program, compensation, provision of a discrimination-free workplace, any other favorable term, condition or privilege of employment."  Subdivision (g)(3) adds that the " 'Provision of a discrimination-free workplace' is a provision of a workplace free of harassment, as defined in section 11019(b)."

these regulatory provisions, she maintains "harassment is actionable under a discrimination cause of action" and therefore "hostile work environment harassment" establishes an adverse employment action for purposes of a discrimination claim.

Plaintiff is mistaken in asserting allegations of harassment, alone, are sufficient to allege an adverse employment action for purposes of a discrimination claim. Our Supreme Court has repeatedly distinguished between discrimination and harassment claims. "In the FEHA, the terms 'discriminate' and 'harass' appear in separate provisions and define distinct wrongs. [Citations.] As relevant here, subdivision (a) of section 12940 makes it 'unlawful' (subject to certain exceptions) '[f]or an employer, because of the [race] . . . of any person . . . to *discriminate* against the person *in compensation or in terms, conditions, or privileges of employment.*' (Italics added.) Subdivision (j)(1) of the same statute makes it unlawful (again subject to certain exceptions) '[f]or an employer . . . or any other person, because of [race] . . . to *harass* an employee. . . .' (§ 12940, subd. (j)(1), italics added.)" (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 705–706 (*Roby*); *Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 931–932 [citing *Roby* and explaining the "primary difference between discrimination and harassment claims"].)

"Because the FEHA treats harassment in a separate provision, there is no reason to construe the FEHA's prohibition against discrimination broadly to include harassment. Hence, our case law makes clear that the FEHA's discrimination provision addresses only *explicit* changes in the 'terms, conditions, or privileges of employment' (§ 12940, subd. (a)); that is, changes involving some *official action taken by the employer*. . . . [¶] By contrast, harassment often does not involve any official exercise of delegated power on

10

behalf of the employer. . . . Thus, harassment focuses on situations in which the *social environment* of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message of the harassed employee." (*Roby, supra,* 47 Cal.4th at p. 706, fn. omitted; *id.* at p. 707 ["discrimination refers to bias in the exercise of official actions on behalf of the employer, and harassment refers to bias that is expressed or communicated through interpersonal relations in the workplace"].)

Accordingly, the elements of a harassment claim are different than those of a discrimination claim. "To establish a prima facie case of harassment, [the plaintiff] must show that (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her protected status; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) defendants are liable for the harassment." (*Galvan v. Dameron Hospital Assn.* (2019) 37 Cal.App.5th 549, 563 (*Galvan*); *Thompson v. City of Monrovia* (2010) 186 Cal.App.4th 860, 876.) In short, an adverse employment action is not a requisite element of a harassment claim. (*Roby, supra,* 47 Cal.4th at p. 708 ["harassment is generally concerned with the *message* conveyed to an employee, and therefore with the social environment of the workplace, whereas discrimination is concerned with explicit changes in the terms or conditions of employment"].)

However, allegations of harassment can support, although not alone establish, an adverse employment action by way of "constructive discharge." " 'Constructive discharge, like actual discharge, is a materially adverse employment action.' " (*Steele v. Youthful Offender Parole Bd.* (2008) 162 Cal.App.4th 1241, 1253.) "Constructive discharge occurs when the

11

employer's conduct effectively forces an employee to resign. Although the employee may say 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation." (*Turner v. Anheauser-Busch* (1994) 7 Cal.4th 1238, 1244–1245 (*Turner*);[8] *Galvan, supra,* 37 Cal.App.5th at pp. 559–560.)

"[T]o establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Turner, supra,* 7 Cal.4th at p. 1251; *Galvan, supra,* 37 Cal.App.5th at p. 560.) "For purposes of this standard, the requisite knowledge or intent must exist on the part of either the employer or those persons who effectively represent the employer, i.e., its officers, directors, managing agents, or supervisory employees." (*Turner,* at p. 1251; *Galvan,* at p. 560.)

"[T]o amount to a constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable. In general, '[s]ingle, trivial, or isolated acts of [misconduct] are insufficient' to support a constructive discharge claim. [Citation.] Moreover, a poor performance rating or a demotion, even when accompanied by reduction in pay, does not by itself trigger a constructive discharge." (*Turner, supra,* 7 Cal.4th at p. 1247, fn. omitted.) " ' "An employee may not be unreasonably sensitive to his [or her] working

---

[8] Overruled in part, on another ground, as stated in *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 498.

environment. . . . Every job has its frustrations, challenges, and disappointments; these inhere in the nature of work. An employee is protected from . . . unreasonably harsh conditions, in excess of those faced by his [or her] co-workers. He [or she] is not, however, guaranteed a working environment free of stress." ' " (*Ibid.*) To be intolerable or aggravated, the employee's working conditions must be "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." (*Id.* at p. 1246.)

As the foregoing discussion makes clear, plaintiff cannot rely on her allegations of harassment by coworkers to provide the requisite "adverse employment action" necessary for her discrimination claim. Thus, while she focuses on her allegations of "specific examples of events leading to [her] experience of a hostile work environment and intolerable working conditions, from the nails found in her tires, to the 'welcome gift' of a dead plant that should be reasonably inferred to indicate callousness and/or ill will by a co-employee," these allegations of coworker harassment are not sufficient to establish an adverse employment action for purposes of her discrimination claim.

We therefore consider plaintiff's other allegations. Her specific allegations included the following:

> - She "was told by her supervisors she would not have access to training." She "was often denied by her supervisor access to trainings." She "asked to attend trainings and was not provided a response." "[T]he three non-African American women in the office were provided with training on Administrative Analyst duties/tasks." "[A] white

13

Administrative Analyst hired during the period [plaintiff] was working for Public Works was provided with extensive training and mentoring."

- She was "instructed [] not to directly interact with the City's other Departments, an integral part of her job." She "was instructed by her supervisor under threat of discipline not to talk to other public works staff." "White administrative analysts were not told they were not allowed to talk with other City Departments."

- She "was denied constructive feedback regarding her work assignments from her supervisor." "[O]ther analysts . . . who were not Black, were not treated in this manner, and were provided with feedback and training by their supervisors."

- Her "[q]uestions and e-mails posed to management went unanswered."

- She "was excluded from meetings or discussions regarding process and policies at the City by her supervisors and/or other managers."

-She "was directed by her supervisor to work out of her classification and job description– to do maintenance work." "She was instructed . . . to repair and clean parking pay stations." She was "directed to repair a parking kiosk machine" even though "trained mechanics had recently attempted to fix the same machine and failed." A "senior manager even stated in a meeting," where plaintiff's internal complaint about directives to perform repair and maintenance tasks was discussed, "such assignments were inconsistent with her job description and she should not be re-assigned in such a manner." "White administrative analysts were not provided maintenance duties that were inconsistent with their job descriptions."

- She "was reprimanded by a supervisor-level employee for walking in areas in a maintenance yard to access an assigned vehicle, while other non-Black employees were not reprimanded for walking within the same area."

- She "was locked out of the building's parking lot because she wasn't provided an access code that was provided to non-Black employees."

- The city "failed to accept" the recommendations of a consultant hired to resolve "discrimination and harassment complaints."

- In December 2014, she "was assigned to a supervisor" who treated her "with a bullying demeanor." In February 2015, she "was informed that her supervisor made very disparaging remarks about her to another City employee."

- After she complained to city officials, "the City failed to remedy and prevent the harassment and discrimination" she experienced. She "continued to experience hostile treatment from co-employees." Her "supervisors continued to not provide her with the requested training [and], feedback, or allow her to work with other City departments." She also "was excluded or removed from projects that were part of her job description without explanation." She "remained assigned to maintenance duties outside her job description."

Plaintiff maintains these alleged actions of her supervisor and other management personnel constituted conduct that adversely changed the terms and conditions of her employment, citing *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413 (*Wysiner*), *Taylor v. City of Los Angeles Dept. of Water & Power* (2006) 144 Cal.App.4th 1216 (*Taylor*),[9] and *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378 (*Patten*).[10]

*Wysinger* involved, among other issues, whether sufficient evidence supported a verdict for the plaintiff on a retaliation claim based on the denial of a transfer to a different office locale more than three years after he filed an age discrimination complaint with the Equal Employment Opportunity Commission. (*Wysinger, supra,* 157 Cal.App.4th at pp. 418–419.) The Court

---

[9] Disapproved on other grounds as stated in *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1173–1174.

[10] Disapproved on other grounds as stated in *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703, 718, footnote 2.

of Appeal concluded there was sufficient evidence of an adverse employment action, pointing out the company's human resources manager testified the transfer "would have been a promotion" and a vice-president "said it involved a higher classification within management and offered a higher salary." (*Id.* at pp. 420, 424.) "Where an employer retaliates by denying prospects for advancement or promotions to employees because they filed age discrimination claims, the employer has engaged in an adverse employment action in violation of FEHA." (*Id.* at p. 420.) The court agreed that a "long period between an employer's adverse employment action" (the denial of transfer) and the employee's earlier protected activity (filing the EEOC claim) "may lead to the inference that the two events are not causally connected." (*Id.* at p. 421.) But if "between these events the employer engages in a pattern of conduct consistent with a retaliatory intent, there may be a causal connection." (*Ibid.*) And in *Wysinger*, there was a pattern of such conduct, which included "undeserved negative job reviews, reductions in his staff, ignoring his health concerns[,] and acts that caused him substantial psychological harm." (*Id.* at p. 424.)

Thus, in *Wysinger* there was evidence the refusal to transfer the plaintiff was effectively a demotion and a reduction in pay, actions long considered adverse employment actions. Plaintiff makes no comparable allegations. However, the court in *Wysinger* also observed that "[w]here an employer retaliates by denying *prospects for advancement* or promotions to employees" the employer has engaged in an adverse employment action in violation of FEHA. (*Wysinger, supra,* 157 Cal.App.4th at p.420, italics added.)

*Patten* also involved a retaliation claim, this one based on a transfer from one middle school where the plaintiff had been the principal to another

16

middle school site where she also was the principal. (*Patten, supra*, 134 Cal.App.4th at pp. 1381–1383.) In reversing a summary judgment for the school district, the court stated the district had "too narrow" a view of an adverse employment action. (*Id.* at pp. 1381, 1389.) The district asserted the plaintiff's transfer was merely a " 'lateral' " move, since she was transferred from one middle school to another and her "wages, benefits and duties (as set forth by job descriptions) remained the same." (*Id.* at p. 1389.) However, the appellate court concluded the two schools "presented different worlds for a principal"—one was a large, "underperforming school," while the other was a very small "magnet school" that did not "present the kinds of administrative challenges an up-and-coming principal wanting to make her mark would relish." Indeed, the transferred-to school was so small a "vice-principal was the administrative head" and the transfer "in reality was a demotion." (*Ibid.*)

Thus, in *Patten,* as in *Wysinger,* the plaintiff effectively suffered a demotion.

*Taylor* also involved a retaliation claim. The plaintiff, a supervisor, alleged he was retaliated against for assisting a subordinate who complained of race discrimination and harassment. (*Taylor, supra*, 144 Cal.App.4th at p. 1222.) Appealing from a judgment of dismissal following the sustaining of a demurrer without leave to amend, the plaintiff maintained he had adequately alleged adverse employment actions and a causal connection between the protected activity (supporting the wrongful termination and harassment claims of his employee) and the adverse employment actions. (*Id.* at pp. 1227, 1232.)

The Court of Appeal agreed, stating that in "[e]xamining the totality of the circumstances alleged, . . . [the plaintiff] sufficiently pleaded that he experienced adverse employment action." (*Taylor, supra*, 144 Cal.App.4th at

17

p. 1233.)  Those circumstances included that his supervisor "stripped him of his supervisory position," threatened to terminate his 4/10 work schedule, barred him from completing supervisory certification courses which would advance his status to "full engineer" and lead to a promotion, "with a potential salary increase of $25,000 and other benefits," "embarrassed him before his subordinate; excluded him from meetings and deprived him of the information necessary to carry out his duties; undermined him by removing important contracts; denied him the emergency appointment to full engineer but required him to train the appointee; accused him of being confrontational; labeled him a troublemaker to prospective supervisors in other groups; disclosed confidential information about [him] to his coworkers; and told him not to expect an emergency appointment to full engineer."  This "continuous course of conduct" culminated in the plaintiff's "low rank on the civil service list for full engineer, a position he was apparently groomed to assume prior to assisting [his subordinate] with his race discrimination complaints."  (*Id.* at pp. 1222–1223, 1232.)  The court concluded this "continuous course of conduct" did not "fall into the category of 'mere offensive utterance or even a pattern of social slights' " and "under 'the realities of the workplace,' they represent[ed] adverse employment actions 'material' to the 'terms, conditions or privileges' of [the plaintiff's] employment."  (*Id.* at p. 1232.)

The actions of which plaintiff complains are not as numerous as those in *Taylor*, nor as egregious, and it is an exceedingly close call whether the conduct plaintiff has alleged is "reasonably likely to do no more than anger or upset an employee" or whether it is "adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion."  (*Yanowitz, supra,* 36 Cal.4th at pp. 1055–1056.)  But given that she has alleged repeated, deliberate conduct that is more than

18

" 'mere offensive utterance[s] or [] a pattern of social slights' " (*Taylor, supra,* 144 Cal.App.4th at p. 1232) and likely to compromise her "prospects for advancement or promotions," we conclude she has cleared, albeit barely, the low pleading threshold required to withstand a demurrer. (See *Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1417, fn. 15 [in "reviewing the propriety of sustaining a demurrer to a complaint without leave to amend, we are not concerned with whether the plaintiff ultimately may be able to prove the allegations in his or her pleading"].)

We are not persuaded that any of the cases the city cites compel a different conclusion. The case with potentially the most significance is *Simers v. Los Angeles Times Communications LLC* (2018) 18 Cal.App.5th 1248 (*Simers*), in which the plaintiff appealed from a judgment notwithstanding the verdict (JNOV) on a constructive termination claim, and new trial on damages on age and disability discrimination claims. (*Id.* at pp. 1251, 1270–1271.) The Court of Appeal affirmed the JNOV.

The plaintiff in *Simers*, a senior journalist of some notoriety, listed "as the intolerable conditions that forced him to resign, the following: (1) the May 28 reduction in his columns from three to two per week; (2) Mr. Duvoisin's statement to Mr. James (conveyed to plaintiff at the May 28 meeting with Mr. James) that plaintiff was a 'public embarrassment' to The Times; (3) Mr. Duvoisin's criticism, conveyed at the May 28 and May 29 meetings, that plaintiff's writing was sloppy and not up to The Times's standards; (4) '[f]alse accus[ations] of unethical conduct'; (5) the suspension of his columns 'for an unreasonable 55 days' (June 24 to Aug. 8); (6) on June 24, plaintiff was 'told not to say anything' about the investigation, so he could not 'explain himself to his sources . . . and fans, damaging his journalistic resources'; (7) he was '[d]amaged in his professional reputation with his

19

column inexplicably absent for two months'; (8) his demotion to an 'entry-level assignment position, based upon false policy violations resulting from discriminatory motives'; (9) the August 8 final warning that 'placed [him] on a performance plan warning of potential termination'; and (10) the September 4 offer of 'an ambiguous columnist position, reporting to editors who falsely accused him and called him untrustworthy.' " (*Simers, supra*, 18 Cal.App.5th at pp. 1270–1271.)

The appellate court concluded, "as a matter of law, that none of these circumstances, alone or in combination, amount[ed] to working conditions that [were] either unusually aggravated or a continuous pattern of mistreatment." (*Simers, supra*, 18 Cal.App.5th at p. 1271.) In so concluding, the court specifically pointed out the publication of the article that triggered this alleged series of events "provided a legitimate basis for an inquiry by defendant." (*Ibid.*) Further, there was "no evidence to support some of" the enumerated acts (*ibid.*), and the remaining complained of actions "consist[ed] only of plaintiff's subjective reaction to standard employer disciplinary actions—criticism, investigation, demotion, performance plan—that, even if undertaken for reasons (plaintiff's age and disability) later found to include discrimination, are well within an employer's prerogative for running its business. Unless those standard tools are employed in an unusually aggravated manner or involve a pattern of continuous mistreatment, their use cannot constitute constructive discharge." (*Ibid.*)

The court recognized " 'a continuous course of such actions, uncorrected by management, can constitute objectively intolerable working conditions.' " (*Simers, supra*, 18 Cal.App.5th at p. 1274.) " '[E]ven though individual incidents in a campaign of harassment do not constitute justification for an employee to resign, the overall campaign of harassment can constitute such a

justification.' " (*Ibid.*, quoting *Thompson v. Tracor Flight Systems, Inc.* (2001) 86 Cal.App.4th 1156, 1172.) But the instant case, said the court, was "nothing like *Thompson*. The evidence plaintiff cites does not show an 'overall campaign of harassment,' as it did in *Thompson*. It show[ed] meetings conveying criticisms (that plaintiff found insulting); suspension of plaintiff's columns while an investigation was conducted (causing plaintiff anxiety and depression); the investigation (which plaintiff felt was 'unfair' and 'unreasonable,' but during which, as the trial court found, '[t]here was no evidence that at any time . . . he was the object, directly or indirectly, of any criticism, hostility or harassment'); and the ultimate demotion and final warning (performance plan), in which The Times indicated the investigation's findings of ethical violations had 'damage[d] our trust in you and in your suitability to serve as a Times columnist' (a conclusion with which plaintiff disagreed). [¶] In short, the evidence showed only plaintiff's personal, subjective reactions to defendant's use of standard disciplinary procedures: criticisms, a suspension, an investigation, and demotion with a performance plan—all performed with no breach of confidentiality and with no harassment or other mistreatment of plaintiff." (*Simers*, at p. 1274.)

Simers does not compel the conclusion that plaintiff's pleading is fatally insufficient. In *Simers,* the Court of Appeal had before it a fully developed record following a month-long trial. We, in contrast, are considering a challenge to the sufficiency of plaintiff's allegations. Accordingly, unlike in *Simers,* we do not have before us undisputed conduct by plaintiff that indisputably warranted immediate cautionary actions by the city, followed by a thorough investigation, and then disciplinary and remedial action, establishing that plaintiff's unhappiness and upset were merely subjective reaction to essential and warranted personnel actions.

The city also cites to *Light v. Department of Parks & Recreation* (2017) 14 Cal.App.5th 75 (*Light*). While the Court of Appeal recited the basic law— i.e., " ' "[a] change that is merely contrary to the employee's interests or not to the employee's liking is insufficient." ' " (*Id*. at p. 92.) " ' "[A] mere oral or written criticism of an employee . . . does not meet the definition of an adverse employment action under [the] FEHA," ' " " '[m]ere ostracism in the workplace is insufficient to establish an adverse employment decision,' " and " ' " '[w]orkplaces are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action,' " ' "— it *reversed* a summary judgment for the city department on the ground the plaintiff had raised a triable issue she had suffered an adverse employment action. (*Id*. at pp. 92–93.)

"When a plaintiff alleges a series of actions that comprise a course of conduct, we need not examine each individually. Instead, we consider the totality of the circumstances to determine whether the plaintiff has suffered an adverse employment action. '[T]here is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries. [Citations.] Enforcing a requirement that each act separately constitute an adverse employment action would subvert the purpose and intent of the statute.' " (*Light, supra*, 14 Cal.App.5th at p. 92, quoting *Yanowitz, supra*, 36 Cal.4th at pp. 1055–1056.)

Viewing the evidence in the manner most favorable to the plaintiff, the court concluded she had "raised a triable issue of material fact, i.e., a reasonable trier of fact could conclude [she] suffered an adverse employment action by the Department following her support of" another's discrimination complaint. (*Light, supra,* 14 Cal.App.5th at p. 92.) "After [plaintiff] was

interviewed by investigators, and refused to tell Seals what they had discussed, Seals isolated [plaintiff], moved her to a different office, verbally and to some extent physically attacked her during the February 23 confrontation, and told her she would no longer work at the Department when her current out-of-class assignment was over. Dolinar rescinded her offer to train [plaintiff] for the LEES office technician position, and [plaintiff] was later rejected for promotion to that position despite having served as an office technician (in an out-of-class assignment) for a number of months. The Department ultimately left the position vacant, despite earlier classifying it as a 'mission critical position.' The Department then reduced [plaintiff's] scheduled hours to zero (as Seals had threatened), having eliminated funding several months prior. Taken together, this evidence could lead a reasonable trier of fact to conclude that [plaintiff's] employment had been materially and adversely affected. Indeed, in the end, [plaintiffs] employment was effectively suspended because the Department did not schedule any hours for her." (*Id.* at pp. 92–93.)

Plaintiff's allegations are, indeed, not as detailed as the recited circumstances in *Light*. But, again, we are dealing here with a demurrer, not a summary judgment record, and whether plaintiff "will ultimately be able to prove the complaint's allegations is not relevant." (*Rufini v. CitiMortgage, Inc.* (2014) 227 Cal.App.4th 299, 304.)

### *Harassment on the Basis of Race*

As we have recited, the trial court sustained the city's demurrer to plaintiff's harassment claim on the ground it had not given plaintiff leave to include the claim in her second amended complaint. However, we are tasked with determining whether plaintiff could have amended her complaint to state such a claim. Indeed, a plaintiff can argue amendment should have

23

been allowed for the first time on appeal. (*Eghtesad v. State Farm General Ins. Co.* (2020) 51 Cal.App.5th 406, 411 [failure to ask the trial court for leave to amend "does not prevent [a plaintiff] from raising the issue for the first time on appeal"]; *Shields v. Hennessy Industries, Inc.* (2012) 205 Cal.App.4th 782, 786 ["appellant may assert the trial court abused its discretion in granting the motion without leave to amend, and it is not a prerequisite to this assertion the appellant first presented to the trial court a specific request to amend or an indication of its legal basis"].) We therefore consider whether plaintiff adequately alleged a harassment claim in her second amended complaint.

Under the FEHA, it is unlawful "[f]or an employer . . . or any other person, because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition[, etc.,] . . . to harass an employee. . . ." (§ 12940, subd. (j)(1).)

"The law prohibiting harassment is violated '[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " ' " (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 263–264 (*Nazir*).) The determination " 'is ordinarily one of fact.' " (*Caldera v. Department of Corrections & Rehabilitation* (2018) 25 Cal.App.5th 31, 38 (*Caldera*).)

"To establish a prima facie case of harassment, [the plaintiff] must show that (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her protected status; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work

environment; and (5) defendants are liable for the harassment." (*Galvan, supra,* 37 Cal.App.5th at p. 563.)

Thus, as we have observed, an "adverse employment action" as that term is understood in the context of *discrimination* and *retaliation* claims is not an element of a *harassment* claim. (See *Roby, supra,* 47 Cal.4th at pp. 706–708 ["it does not matter for purposes of proving harassment whether the harasser is the president of the company or an entry-level clerk"; "discrimination refers to bias in the exercise of official actions on behalf of the employer, and harassment refers to bias that is expressed or communicated through interpersonal relations in the workplace"; "harassment is generally concerned with the *message* conveyed to an employee, and therefore with the social environment of the workplace, whereas discrimination is concerned with explicit changes in the terms or conditions of employment"].)

Rather, the plaintiff must establish "an intimidating, hostile, or abusive work environment." " 'A discriminatorily abusive work environment . . . can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers.' " (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 130 (*Aguilar*), quoting *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 22; *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 870 (*Serri*) [" ' "[T]he plaintiff [in a harassment case] must prove that the defendant's conduct would have interfered with a reasonable employee's . . . work performance and would have seriously affected the psychological well-being of a reasonable employee and that [he or she] was actually offended." ' "].)

" '[C]ommonly necessary personnel management actions such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support,

25

the assignment or nonassignment of supervisory functions, deciding who will and who will not attend meetings, deciding who will be laid off, and the like, do not come within the meaning of harassment.  These are actions of a type necessary to carry out the duties of business and personnel management.  These actions may retrospectively be found discriminatory if based on improper motives, but in that event the remedies provided by the FEHA are those for discrimination, not harassment.  Harassment, by contrast, consists of actions outside the scope of job duties which are not of a type necessary to business and personnel management.' " (*Serri, supra*, 226 Cal.App.4th at p. 870, quoting *Reno v. Baird* (1998) 18 Cal.4th 640, 646–647, superseded by § 12940, subd. (j)(3).)

Nevertheless, a supervisor's actions can constitute evidence supporting a harassment claim.  As our Supreme Court explained in *Roby,* "some official employment actions done in furtherance of a supervisor's managerial role can also have a secondary effect of communicating a hostile message.  This occurs when the actions establish a widespread pattern of bias." (*Roby, supra,* 47 Cal.4th at p. 709.)  For example, in *Roby,* the court ruled the disability harassment verdict was supported by actions by the plaintiff's supervisor which included demeaning comments to Roby about her body odor and arm sores, refusal to respond to Roby's greetings, demeaning facial expressions and gestures toward Roby, and disparate treatment of Roby in handing out small gifts.  (*Ibid.*)  "None of these events [could] fairly be characterized as an official employment action. . . .  Rather, these were events that were unrelated to [the supervisor's] managerial role, engaged in for her own purposes." (*Ibid.*)  Even actions that can best be "characterized as official employment actions rather than hostile social interactions in the workplace . . . may have contributed to the hostile message that [the supervisor] was

26

expressing to Roby in other, more explicit ways.  These would include [the supervisor's] shunning of Roby during staff meetings, . . . belittling of Roby's job, and . . . reprimands of Roby in front of Roby's coworkers." (*Ibid.*)  Thus, "in analyzing the sufficiency of evidence in support of a harassment claim, there is no basis for excluding evidence of biased personnel management actions so long as that evidence is relevant to prove the communication of a hostile message." (*Id.* at p. 708.)

"All harassment claims require severe *or* pervasive conduct.  [Citation.] The words 'severe' and 'pervasive' have no peculiar meanings under the law. The adjective 'severe' is defined as 'strongly critical and condemnatory' or 'inflicting pain or distress.'  (Webster's Collegiate Dict. (11th ed. 2007) p. 1140, col. 2.)  The verb 'pervade' is defined as 'to become diffused throughout every part of.'  (*Id.* at p. 925, col. 2.)" (*Caldera, supra,* 25 Cal.App.5th at p. 38.)

Thus, "not every utterance of a racial slur in the workplace violates the FEHA." (*Aguilar, supra,* 21 Cal.4th at p. 130; *Etter v. Veriflo Corp.* (1998) 67 Cal.App.4th 457, 466 (*Etter*) [for racial harassment to be sufficiently severe or pervasive, " 'the acts of racial harassment cannot be occasional, isolated, sporadic, or trivial' "].)

In deciding whether harassment is sufficiently severe or pervasive, a jury may consider " 'any or all of the following:  [¶] (a) The nature of the conduct; [¶] (b) How often, and over what period of time, the conduct occurred; [¶] (c) The circumstances under which the conduct occurred; [¶] (d) Whether the conduct was physically threatening or humiliating; [¶] (e) The extent to which the conduct unreasonably interfered with an employee's work performance.' " (*Caldera, supra,* 25 Cal.App.5th at pp. 38–39, quoting CACI No. 2524, italics omitted; *Etter, supra,* 67 Cal.App.4th at p. 466.)

27

In light of *Roby,* we therefore must consider more than plaintiff's allegations of harassment by her co-workers, i.e., "discover[ing] nails in her tires" and "receive[ing] a dead plant as a 'welcome gift,' " in determining whether she adequately alleged a claim for harassment. We must also consider most of the allegations she has made of allegedly discriminatory actions by supervisors including that she was denied access to training, she was told not to contact anyone in other departments, she was denied feedback, her questions and e-mails were ignored, she was excluded from meetings and discussions, she was told to perform maintenance work outside her job classification, she was reprimanded for conduct others were not, and she was bullied and spoken about disparagingly.

Again, whether the totality of these alleged acts suffice to state a claim of harassment is a close question. But, for purposes of pleading, we conclude they are sufficient.

### *Failure to Prevent Discrimination and Harassment Claims*

Because the trial court concluded plaintiff failed to allege discrimination and harassment claims, it concluded the same with respect to her failure to prevent discrimination and harassment claims. (See *Caldera, supra,* 25 Cal.App.5th at p. 44 ["There can be no liability for an employers' failure to prevent harassment claim unless actionable harassment occurred."].) Since we have concluded otherwise, we consider whether her allegations are sufficient to state failure to prevent claims.

" 'When a plaintiff seeks to recover damages based on a claim of failure to prevent . . . harassment she must show three essential elements: 1) plaintiff was subjected to . . . harassment . . . ; 2) defendant failed to take all reasonable steps to prevent . . . harassment . . . ; and 3) this failure caused plaintiff to suffer injury, damage, loss or harm.' " (*Caldera, supra,*

28

25 Cal.App.5th at pp. 43–44, quoting *Lelaind v. City and County of San Francisco* (N.D. Cal. 2008) 576 F.Supp.2d 1079, 1103, italics omitted.)

Plaintiff alleged that although she complained to "City officials," she "continued to experience hostile treatment from co-employees." Her "supervisors continued to not provide her with the requested training [and], feedback, or allow her to work with other City departments." She also "was excluded or removed from projects that were part of her job description without explanation," and "remained assigned to maintenance duties outside her job description." These allegations, albeit sparse, are sufficient for purposes of pleading. (See *Caldera, supra,* 25 Cal.App.5th at p. 44 [evidence that harassing conduct continued after training sufficient to support failure to prevent verdict]; *Nazir, supra,* 178 Cal.App.4th at p. 288 [since the defendant sought and was granted summary adjudication of failure to prevent claims on the sole basis there was no harassment or discrimination, reversal of summary adjudication on the harassment and discrimination claims dictated reversal of the summary adjudication on the failure to prevent claims].)

## DISPOSITION

The judgment of dismissal is REVERSED. Appellant to recover costs on appeal.

_____
Banke, J.

We concur:

_____
Margulies, Acting P.J.

_____
Bowen, J.*

**Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A165551, Robinson v. City of Vallejo